Clara SIMS, et al., Plaintiffs,

W.T. Scott, et al., Plaintiff–Intervenors,

v.

MONTGOMERY COUNTY COMMISSION, et al., Defendants,

Albert B. Dodson, et al., Defendant–Intervenors.

Sallie WILLIAMS and Johnie Love, Plaintiffs,

v.

MONTGOMERY COUNTY SHERIFF'S DEPARTMENT, et al., Defendants,

Albert B. Dodson, et al., Defendant–Intervenors.

Civ. A. Nos. 3708–N, 82–T–717–N.

United States District Court, M.D. Alabama, Northern Division.

May 19, 1995.

Wayne Sabel, Montgomery, AL, for Williams/Love Class.

Rick Williams, David G. Flack, Montgomery, AL, for Dodson intervenors.

Thomas T. Gallion, III, Haskell, Slaughter, Young & Johnston, P.A., Montgomery, AL, for Montgomery Co. Com'n and David Stockman, etc. and Montgomery County Sheriff's Dept.

Tyrone C. Means, Mark Englehart, Kenneth L. Thomas, Cynthia Clinton, Thomas, Means & Gillis, P.C., Montgomery, AL, for Montgomery County Com'n. and Montgomery County Sheriff's Dept.

Delores Boyd, Montgomery, AL (Court-appointed), for named plaintiffs, named intervenors and Sims/Scott Classes.

Sylvester Hardy, pro se.

Alvah Reid, Sr., pro se.

## MEMORANDUM OPINION

MYRON H. THOMPSON, Chief Judge.

Pending before the court is a proposed agreement settling objections to the Montgomery County Sheriff's Department's 1993 selections for promotion to sergeant and lieutenant in the department's law enforcement

division.[1] The "Dodson intervenors," who represent all white male officers in the department, object to the agreement. For the reasons discussed below and upon examination of all the evidence, the court concludes that the proposed agreement should be approved.

## I. BACKGROUND

This litigation consists of two consolidated class-action lawsuits. In *Sims v. Montgomery County Comm'n*, civil action no. 3708–N (M.D.Ala.), initiated in 1972, a class of black employees sought relief from the Montgomery County Sheriff's Department's racially discriminatory employment practices. In *Williams v. Montgomery County Sheriff's Dept.*, civil action no. 82–T–717–N (M.D.Ala.), filed ten years later, a class of female employees and applicants for employment charged the department with sex discrimination.[2]

Recently, in a memorandum opinion entered on December 29, 1994, the court set forth in some detail the background of this litigation. *See Sims v. Montgomery County Comm'n*, 873 F.Supp. 585 (M.D.Ala.1994). Because, as explained below, the proposed agreement regarding the department's 1993 selections for promotion to sergeant and lieutenant is subject to "strict scrutiny," it is necessary to repeat that background, though not in its entirety. In the *Sims* litigation in 1973, the court approved and entered a consent decree requiring that the Montgomery County Commission conduct "all hiring and personnel practices, programs and procedures on a non-discriminatory basis without regard to race, color, creed or national origin." Civil action no. 3708–N (M.D.Ala. March 22, 1973) (plan attached at 1, ¶ 1). The 1973 *Sims* decree further provides that, unless approved or "validated" under standards and procedures set out in the decree, a selection procedure can be used only if it does "not have a disproportionate detrimental impact upon minority applicants." *Id.* (plan attached at 6, ¶ 6).

Fifteen years later, in 1988, four African–American officers, collectively called the "Scott intervenors," moved to intervene in the *Sims* litigation, charging that the Montgomery County Sheriff's Department was continuing to discriminate against black employees in violation of the 1973 *Sims* decree. The court certified a plaintiff-intervenor class of all "black persons who are past, current, and future employees of the Montgomery County Sheriff's Department." Civil action no. 3708–N (M.D. Ala. Nov. 2, 1988). As a result of this round of litigation, the court on November 27, 1990, entered a permanent injunction prohibiting the department from further racial discrimination and requiring the department to change its personnel procedures. *Sims v. Montgomery County Comm'n*, 766 F.Supp. 1052, 1102–03 (M.D.Ala.1990). In an accompanying judgment and injunction, the court required that the department fashion, by an established deadline, new, nondiscriminatory procedures for promotion of non-blacks and blacks. 766 F.Supp. 1052 (M.D.Ala.1990).

In the *Williams* litigation in 1983, the court certified a plaintiff class of "all past, present, and future female employees of the Montgomery County Sheriff's Department." *Johnson v. Montgomery County Sheriff's Dept.*, 99 F.R.D. 562, 566 (M.D.Ala.1983). Two years later, in 1985, as a result of this litigation, the court approved and entered a consent decree prohibiting the department from discriminating against its female officers and requiring that it adopt new, nondiscriminatory policies with regard to promotions, transfers, and job and shift assignments. *Johnson v. Montgomery County Sheriff's Dept.*, 604 F.Supp. 1346 (M.D.Ala. 1985). The department agreed to develop

---

1. The department is divided into two divisions: corrections and law enforcement. The law enforcement division is responsible for the operation of the Montgomery County Detention Center, also known as the county jail. *Sims v. Montgomery County Comm'n*, 766 F.Supp. 1052, 1062 (M.D.Ala.1990).

2. *Williams v. Montgomery County Sheriff's Dept.*, civil action no. 82–T–717–N (M.D.Ala.), was originally brought by Lois Johnson and was, until recently, styled *Johnson v. Montgomery County Sheriff's Dept.* The style changed when Sallie Williams and Johnie Love replaced Johnson as plaintiffs.

promotion procedures that conform with the "1978 Uniform Guidelines [on Employee Selection Procedures,] 29 CFR § 1607 et seq.," *id.* at 1354, and that "would have little or no adverse impact on women seeking to be ... promoted to ranking positions." *Id.* The 1985 decree provides that "Adverse impact will be measured by the 'four fifths rule' set forth in § 4(D) of the Uniform Guidelines."[3] *Id.* at 1355.

In 1986, the *Williams* class filed a request for additional relief. In a 1986 supplemental consent decree resolving the request, the department agreed to hire an independent professional consultant, mutually selected by the parties, to develop temporary and eventually permanent promotion procedures for all ranks as required by the 1985 decree. Civil action no. 82–T–717–N, at 5 (M.D.Ala. July 24, 1986). In 1988, the *Williams* class charged that the department was continuing to discriminate against women. As a result of this round of litigation, the court on November 27, 1990, found that the department had discriminated and retaliated against female employees, and entered a permanent injunction prohibiting the department and its officers from engaging in further sexual discrimination and retaliation, and requiring the department to take affirmative and immediate steps to address sexual harassment and discrimination within the department. *Sims,* 766 F.Supp. at 1079–80. In an accompanying judgment and injunction, the court also required that the department fashion, by an established deadline, new, nondiscriminatory procedures for promotion of men and women. 766 F.Supp. 1052 (M.D.Ala.1990).

In 1990, the court permitted a group of white male deputies, collectively called the "Dodson intervenors," to intervene in this litigation. 766 F.Supp. 1052 (M.D.Ala.1990).

In 1992, the court certified the Dodson intervenors as a class for the purpose of challenging promotion procedures within the department. *Id.* (May 18, 1992).[4]

In 1992, in an effort to comply with the court's judgment and injunction entered in both the *Sims* and *Williams* cases on November 27, 1990, the department submitted an interim plan, and this plan was approved by the court. Civil action nos. 3708–N & 82–T–717–N (M.D.Ala. Jan. 13, 1992). The interim plan did not establish policies and procedures for promotions but instead provided for procedures by which African–Americans and women in the department could file objections to the specific promotion procedures later developed under the plan if these procedures would "result in adverse impact against a protected class or otherwise violate the rights of a protected class under an outstanding Court order."[5]

In 1993, the Center for Business and Economic Development of Auburn University at Montgomery, directed by John G. Veres, III, Ph.D., the professional consultant jointly selected by the parties, developed and administered specific procedures for promotion to sergeant and lieutenant in the department's law enforcement division. Selection procedures for promotion to sergeant consisted of a written test and a structured oral interview, and those for promotion to lieutenant consisted of a structured oral interview, role play exercises, and a writing sample exercise.

On October 22, 1993, the Dodson intervenors filed an objection to the procedures for promotion to sergeant and lieutenant and petitioned the court to establish race-and-sex neutral promotion procedures. The intervenors alleged, among other things, that the procedures are invalid under the 1978 Uniform Guidelines, are racially and sexually

---

**3.** In a memorandum opinion entered on December 29, 1994, the court held that, although the 1973 *Sims* decree used the term "detrimental impact," both the 1973 *Sims* decree and the 1985 *Williams* decree should be interpreted to incorporate the 1978 Uniform Guidelines' four-fifths rule. *Sims,* 873 F.Supp. at 600.

**4.** The court found that the intervenors did not have standing to challenge hiring, recruitment,

or job assignments in the department. Civil action nos. 3708–N & 82–T–717–N, at 7–8, 1992 WL 714818 (M.D.Ala. May 18, 1992).

**5.** Joint petition for approval of interim plan, filed January 7, 1992, at ¶ 1. In the memorandum opinion of December 29, 1994, the court incorrectly suggested that the interim plan contained new policies and procedures for promotion. *Sims,* 873 F.Supp. at 594.

biased and afford the Sheriff's Department too much discretion to select from within a band, and finally that some white applicants were not given adequate notice of the giving of the tests.

On December 15 and 16, 1993, the Sheriff's Department made its selections for promotion to sergeant and lieutenant from among the candidates in band A, the highest band, certified for each rank. Ten white males, one African–American male, and one African–American female scored in the sergeant's band A certification, and two white males, one white female, and one African–American female scored in the lieutenant's band A certification. Because there were no court-approved guidelines to govern the choice of candidates considered equally qualified within a band, the department's selections "were made with consideration of any adverse impact as to race or gender and thereafter, based upon seniority first as to 'time in grade' and second as to time served as a deputy sheriff."[6] The department selected two white males, Robert L. Ingram and Mark C. Thompson, for promotion to sergeant and lieutenant in the enforcement division.

On December 21, 1993, the Sims plaintiffs and the Scott intervenors objected to the selection of two white males and moved to enjoin the selections. They alleged, among other things, that the Sheriff's Department's selections from within the bands was "unaided by any judicially approved guidelines" and was based on " 'seniority' as the determinative factor . . ., thereby perpetuating the Department's proven policy and practice of discriminating against African Americans, who were not even employed in the enforcement division until 1988 and remain woefully under-represented in the 'rank' positions of Sergeant and Lieutenant."[7] Because there was just one vacancy each for promotion to sergeant and to lieutenant, the Sims plaintiffs and the Scott intervenors characterized the department's stated consideration of ad-

verse impact as "statistically irrelevant."[8] See Question 21 of the Questions and Answers to Clarify and Provide a Common Interpretation of the Uniform Guidelines, 44 Fed.Reg. 11996 (March 2, 1979) (suggesting that "four-fifths rule" by itself is inadequate for measuring adverse impact when the sample size is too small to be statistically significant.) Thus, they argued that African–American officers continued to be discriminated against because of the department's dilatoriness in developing permanent, nondiscriminatory promotion procedures, including nondiscriminatory guidelines for the department's selections from within a band. The department agreed not to carry out the promotions pending court resolution of the objections.

On October 20, 1994, the Sims plaintiffs, the Scott intervenors, and the defendants jointly moved for approval of an agreement settling the Sims plaintiffs' and the Scott intervenors' objection to the 1993 selections for promotion to sergeant and lieutenant. Under the agreement, in addition to the two whites selected for promotion to sergeant and lieutenant, the department must select two African–Americans from the top scoring band of most qualified candidates. The agreement provides with regard to the rank of sergeant that "Defendant Montgomery County Commission will fund forthwith another vacancy for promotion to 'Deputy Sheriff Sergeant,' to which the Sheriff will select for promotion either of the two African–American officers who scored in Band A as a result of the 1993 promotional procedures administered, Terrence Crawford and Sherri Williams." "The Sheriff's selection of Robert Ingram from Band A for promotion to Deputy Sheriff Sergeant," the agreement continues, "shall be effective on the same effective date for the Sheriff's selection of either African–American officer for promotion."

With regard to the rank of lieutenant, the agreement provides that "Defendant Mont-

---

**6.** Defendants' response to objection, filed on January 6, 1994, at ¶ 2.

**7.** Sims plaintiffs and Scott intervenors' objections and motion to enjoin, filed on December 21, 1993, at 2.

**8.** *Id.*

gomery County Commission will fund forthwith another vacancy for promotion to 'Deputy Sheriff Lieutenant,' to which the Sheriff will select for promotion Sgt. Rosie Moses, the African–American officer who scored in Band A as a result of the 1993 promotional procedures administered." "The Sheriff's selection of Mark Thompson from Band A for promotion to Deputy Sheriff Lieutenant," the agreement continues, "shall be effective on the same effective date for the Sheriff's selection of Sgt. Moses for promotion."

On October 24, 1994, the Dodson intervenors responded to this settlement with what they call "further objections." They contended that the settlement was an illegal "agreement to promote two African Americans over more qualified white Americans even though not required under adverse impact."[9]

In 1994, as required by the court in its judgment and injunction of November 27, 1990, the department submitted new, nondiscriminatory permanent promotion procedures, and these procedures were approved by the court. Civil action nos. 3708–N & 82–T–717–N (M.D.Ala. Dec. 7, 1994).

## II.  DISCUSSION

The Dodson intervenors' challenge to the proposed agreement settling objections to the Montgomery County Sheriff's Department's 1993 selections for promotion to sergeant and lieutenant in the department's law enforcement division may be broken down into three categories.

### A.  *Claim of Racial Manipulation of Test Scores*

The Dodson intervenors claim that Veres and his staff selected, weighed, and scored test materials in a manner that would advantage African–Americans.[10] The intervenors charge that this practice violates the 1973 *Sims* decree's requirement that the Sheriff's Department conduct "all ... personnel practices, programs and procedures on a non-discriminatory basis without regard to race." Civil action no. 3708–N (M.D.Ala. March 22, 1973) (plan attached at 1, ¶ 1). They charge that the practice further violates Title VII of the Civil Rights Act of 1964, as amended, in particular 42 U.S.C.A. § 2000e–2($l$), which provides that,

"It shall be an unlawful employment practice for a respondent, in connection with the selection or referral of applicants or candidates for employment or promotion, to adjust the scores of, use different cutoff scores for, or otherwise alter the results of, employment related tests on the basis of race, color, religion, sex, or national origin."

This claim must fail, first, because the intervenors have not submitted any evidence to support the claim, and, second, because the Sims plaintiffs, the Scott intervenors, and the defendants have presented affirmative and sufficient credible evidence to refute the claim. Veres testified: "I absolutely deny having any consultations with the Sheriff's Department prior to banding of the candidates' scores; that has never been my practice, and it was not done on this occasion."[11] The Dodson intervenors' attorney's "scenario of a sinister, conspiratorial scheme to manipulate the scores in order to eliminate senior White officers," Veres continued, "exists solely in his imagination and desire."[12] The Sims plaintiffs, the Scott intervenors, and the defendants also presented evidence outlining the legitimate nondiscriminatory considerations guiding the choice of selection procedures and the method used to score the examinations.[13] Moreover, the Dodson intervenors' own expert, Martin Shapiro, refuted

9.  Dodson intervenors' brief, filed on November 8, 1994, at 8. Two white females joined in the Dodson intervenors' objections. Civil action nos. 3708–N & 82–T–717–N, at 1482–83 (M.D.Ala. May 19, 1995). However, because they added nothing substantively to the objections, the court has not treated them separately.

10.  Dodson intervenors' further objections to the 1993 selection procedures, filed October 24, 1994.

11.  Sims plaintiffs and Scott intervenors' brief, filed November 10, 1994 (affidavit of Veres at 3, attached as Exhibit A).

12.  *Id.*

13.  *Id.* (affidavit of Veres, attached as exhibit A, and affidavit of Hall, attached as exhibit B).

their allegation that written test questions were eliminated based on race.[14] The court finds that Veres and his staff did not select, weigh, and score test materials in a manner that would advantage African–Americans.

### B. *Claim of Lack of Tutorial Help and Notice of Test*

■ The Dodson intervenors claim that white deputies were denied tutorial help and given insufficient notice of the testing procedures for the sergeant promotion. The court assumes that the intervenors are asserting a claim of intentional discrimination against white deputies. However, whether the claim is premised on intentional discrimination or not, the Sims plaintiffs, the Scott intervenors, and the defendants have presented affirmative evidence—primarily through the testimony of Lucy B. Hall, who served as Project Manager under Veres for the development, administration, and scoring of the 1993 procedures to select candidates for promotion to sergeant and lieutenant—and the court so finds, that sufficient notice of the tests and sufficient tutorial help were given to all eligible officers, without regard to the race of the officers.[15]

The Dodson intervenors appear to suggest—the word suggest is used because, as is often the case with the Dodson intervenors, the nature of their arguments cannot be easily discerned from their briefs—that inadequate notice of the application deadline for promotion to sergeant had a "disparate impact" on white males, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 1981a, 2000e through 2000e–17, in that a lower proportion of white males applied for the promotion.[16] As the court explained in its memorandum opinion of November 27, 1990,

"A 'disparate impact' claim differs from a 'disparate treatment' claim in that, with the latter, an employee must prove intentional discrimination, *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981), but with the former, the employee challenges 'practices that are fair in form but discriminatory in operation,' *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 645, 109 S.Ct. 2115, 2119, 104 L.Ed.2d 733 (1989) (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971)); the employee need not prove intentional discrimination. *Wards Cove*, 490 U.S. at 645–46, 109 S.Ct. at 2119."

*Sims*, 766 F.Supp. at 1100. Under Title VII,

"An unlawful employment practice based on disparate impact is established . . . only if—(I) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity; or

(ii) the complaining party makes the demonstration described in subparagraph (c) with respect to an alternative employment practice and the respondent refuses to adopt such alternative employment practice."

42 U.S.C.A. § 2000e–2(k)(1)(A).[17]

First, the "four-fifth's rule analysis" submitted by the Dodson intervenors in support of a finding of disparate impact is simply incomprehensible to the court.[18] Moreover,

---

**14.** Joint motion for approval of "Promotions Plan and Policies," filed October 20, 1994 (deposition of Shapiro, volume 12 of appendix, at 46–51).

**15.** Sims plaintiffs and Scott intervenors' brief, filed November 10, 1994 (affidavit of Hall, attached as exhibit B).

**16.** Dodson intervenors' brief, filed on November 8, 1994, at 6–7.

**17.** Section 2000e–2(k)(1)(A), as amended in 1991, "expressly reinstated the law of 'business

justification' as it existed before *Wards Cove* was decided" and "returned the burden of persuasion regarding business justification to the defendant employer." *Bradley v. Pizzaco of Nebraska, Inc.*, 7 F.3d 795, 797 (8th Cir.1993).

**18.** The analysis was not based on any expert testimony but rather was apparently put together by the Dodson intervenors' attorney himself. Dodson intervenors' brief, filed on November 8, 1994, at 6–7. Indeed, the intervenors' attorney confusingly states at one point that the "4/5 rule is not relevant." *Id.*

even assuming the presence of disparate impact, the court is convinced, and so finds, that the practice challenged by the Dodson intervenors was "job related . . . and consistent with business necessity." 42 U.S.C.A. § 2000e–2(k)(1)(A). The Dodson intervenors' disparate impact claim lacks merit.

C. *Legality of the 1993 Promotions*

■■■ The Dodson intervenors claim that the settlement agreement must be subjected to "strict scrutiny" because two African–Americans will be promoted over "more qualified" white applicants. It is now axiomatic that, absent necessary justification, the fourteenth amendment prohibits governmentally imposed racially discriminatory classifications. *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989); *Johnson v. Transportation Agency*, 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987). Under the equal protection clause, this court must apply strict scrutiny to race-conscious relief voluntarily implemented by a public employer, irrespective of whether the relief is embodied in merely a personnel decision or in a consent decree. *In re Birmingham Reverse Discrimination Emp. Lit.*, 20 F.3d 1525, 1534 (11th Cir.1994); *Shuford v. Alabama State Bd. of Educ.*, 846 F.Supp. 1511, 1520 (M.D.Ala.1994); *see also Croson*, 488 U.S. at 503, 506, 109 S.Ct. at 727, 728 (majority opinion applies strict scrutiny); *Peightal v. Metro. Dade County*, 26 F.3d 1545, 1552 (11th Cir.1994). The "purpose of strict scrutiny is to 'smoke out' illegitimate uses of race by assuring that the [defendant] is pursuing a goal important enough to warrant use of a highly suspect tool. The test also ensures that the means chosen 'fit' this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Croson*, 488 U.S. at 493, 109 S.Ct. at 721. Thus, there are two prongs to the strict scrutiny analysis: first, "any racial

classification 'must be justified by a compelling governmental interest,' " and, second, "the means chosen by the State to effectuate its purpose must be 'narrowly tailored to the achievement of that goal.' " *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 285, 106 S.Ct. 1842, 1852, 90 L.Ed.2d 260 (1986) (plurality opinion) (citations omitted); *see also Ensley Branch, NAACP v. Seibels*, 31 F.3d 1548, 1564 (11th Cir.1994); *Peightal*, 26 F.3d at 1552–53.

The Sims plaintiffs, the Scott intervenors, and the defendants contend that strict scrutiny analysis is not required because all those in the sergeant and lieutenant bands from which the African–Americans are to be selected are equally qualified, that is, African–Americans were not selected over more qualified whites.[19] The court agrees with the Sims plaintiffs, the Scott intervenors, and the defendants that African–Americans were not selected over more qualified whites. The record is clear that all those in band A for both the sergeant and lieutenant positions were equally qualified. Admittedly, there were small score differences within the band, but, as Veres explained, "Banding has the advantage of explicitly considering the *Uniform Guidelines* warning to avoid overinterpreting small score differences."[20]

The Dodson intervenors contend that the officers within a band are, in fact, not equally qualified based on such factors as seniority, experience, training and education, and the intervenors ask that the court itself reevaluate these officers based on these factors. The intervenors, first, have presented only the subjective opinions of a number of officers, mostly testifying as to why they are more qualified than anyone else; they have not presented disinterested and credible evidence that based on these factors the blacks to be selected under the proposed decree are less qualified than the whites who will not be

**19.** The Sims plaintiffs and the Scott intervenors argue that the agreement is a "legitimate" agreement "to resolve objections to [the Sheriff's Department's] initial selections by promoting African Americans, who, like their White counterparts, scored in the superior band of qualified candidates. In the absence of proof that this resolution effects racial discrimination on a protected class, the agreement is due to be ap-

proved. . . ." Sims plaintiffs and Scott intervenors' brief, filed November 10, 1994, at 18.

**20.** Joint motion for approval of "Promotions Plan and Policies," filed October 20, 1994 (Report on the Proposed Plan for a Permanent Promotion System in the Montgomery County Sheriff's Department, volume I at 25).

selected. Second, they have not shown how the court should go about measuring and applying these factors and then making a determination of who is more and who is less qualified. The Dodson intervenors' contention that those within a band are not equally qualified is meritless.

■ The court, however, does not agree with the further contention of the Sims plaintiffs, the Scott intervenors, and the defendants that, because the blacks to be selected will be chosen from within a band of equally qualified persons, strict scrutiny analysis is not required. The fact that black persons are being chosen because of their race is not diminished by the additional fact that these black persons are equally qualified with the whites who are not being selected: the troubling fact remains that the action to be taken is race conscious, and, under the equal protection clause, this court must apply strict scrutiny to race-conscious decisions. *In re Birmingham Reverse Discrimination Emp. Lit.,* 20 F.3d at 1534. The Sims plaintiffs, the Scott intervenors, and the defendants are essentially arguing a "good faith" defense, that is, that an attempt to favor blacks may exist without the intent to harm white deputies. This court has already examined and rejected this argument in its memorandum opinion of December 29, 1994. There, the court wrote that, "The Supreme Court has expressly rejected this argument, stating 'that equal protection analysis "is not dependent on the race of those burdened or benefited by a particular classification." ' *Shaw v. Reno,* —— U.S. ——, ——, 113 S.Ct. 2816, 2829, 125 L.Ed.2d 511 (1993) (quoting *Croson,* 488 U.S. at 494, 109 S.Ct. at 722 (1989) (plurality opinion))." *Sims,* 873 F.Supp. at 597.

■ The court will therefore apply strict scrutiny analysis to the proposed agreement to promote two African–American officers to the positions of sergeant and lieutenant. The Supreme Court has indicated that the government "unquestionably has a compelling interest in remedying past and present discrimination." *United States v. Paradise,* 480 U.S. 149, 167, 107 S.Ct. 1053, 1064, 94 L.Ed.2d 203 (1987) (plurality opinion); *see also Seibels,* 31 F.3d at 1565; *Peightal,* 26

F.3d at 1552. Whether race-conscious relief serves a remedial purpose with respect to past discrimination is an evidentiary issue. *Seibels,* 31 F.3d at 1565; *Peightal,* 26 F.3d at 1553. The court need not make "formal findings" of discrimination; rather, there must be a "strong basis in evidence" for the conclusion that the consent decree or voluntary action remedies past discrimination. *Croson,* 488 U.S. at 500, 109 S.Ct. at 725 (quoting *Wygant,* 476 U.S. at 277, 106 S.Ct. at 1849); *see also Peightal,* 26 F.3d at 1553; *Shuford,* 846 F.Supp. at 1521.

The court hereby adopts the background history of race discrimination in the Sheriff's Department documented in the memorandum opinions of December 29, 1994, *Sims v. Montgomery County Commission,* 873 F.Supp. 585 (M.D.Ala.1994), and November 27, 1990, *Sims v. Montgomery County Comm'n,* 766 F.Supp. 1052 (M.D.Ala.1990). There, the court found that the Sheriff's Department "had intentionally discriminated against blacks in ... promotion, and especially in the enforcement division." 873 F.Supp. at 605. Admittedly, the period of time addressed in these two opinions was up until 1988. However, the black officers in the department have continued to suffer the vestiges of this past discrimination. In the judgment that accompanied the memorandum opinion entered on November 27, 1990, the court required, as part of the relief to redress the longstanding past discrimination, that the defendants fashion within six months new, nondiscriminatory permanent promotion procedures for the department. However, not until 1994 did the defendants do this, Civil Action nos. 3708–N & 82–717–N (M.D.Ala. Dec. 7, 1994), long after the 1993 promotions.

The race-conscious relief before the court, therefore, is "lawful if it represents a 'narrowly-tailored' effort to remedy past ... discrimination" against African–Americans in the Sheriff's Department. *Stuart v. Roache,* 951 F.2d 446, 449 (1st Cir.1991), *cert. denied,* 504 U.S. 913, 112 S.Ct. 1948, 118 L.Ed.2d 553 (1992). The Supreme Court has set forth several factors to determine whether race-conscious relief is narrowly tailored: the necessity for the relief and the efficacy of alter-

native remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market (the "over- or under-inclusiveness" of the relief); and the impact of relief on the rights of third parties. *Paradise,* 480 U.S. at 179, 107 S.Ct. at 1070; *Shuford,* 846 F.Supp. at 1528.

■ First, the proposed promotional relief is necessary. The proposed agreement will allow the department to continue with 1993 promotions without perpetuating the history of race discrimination that led to findings of the court in its 1990 opinion. In addition, black officers will not be penalized because of the department's failure to fashion new, non-discriminatory promotion procedures in a timely manner. The court is unaware of any alternative remedies that would serve all parties as fairly and as well as the proposed agreement. Second, the relief is flexible and of short duration. The promotion of two blacks and two whites, all of whom are equally qualified, is a one-time measure. *See Paradise,* 480 U.S. at 165–86, 107 S.Ct. at 1074 (plurality opinion) (approving one-time imposition of race-conscious promotions until valid promotion procedures could be developed and implemented); *Seibels,* 31 F.3d at 1571 ("An end to racial discrimination demands the development of valid, non-discriminatory selection procedures to replace race-conscious selection procedures"). Indeed, as stated, the court has now approved valid, nondiscriminatory permanent promotion pro-

cedures for the department. Civil action nos. 3708–N & 82–717–N (M.D.Ala. Dec. 7, 1994). *Contrast Seibels,* 31 F.3d at 1571 ("Although the decree ordered the Board to comply with Title VII by developing valid tests, it provided no deadlines or formal review mechanism to ensure that the Board actually did so. That omission turned out to be a serious flaw"). Third, the four proposed promotions are neither over-inclusive nor under-inclusive. The promotions will apply only to those who were qualified for promotion within the department. *See Paradise,* 480 U.S. at 177–78, 107 S.Ct. at 1070 (plurality) (relief was appropriate where only qualified applicants were promoted and where employer not obligated to make unnecessary or gratuitous promotions). The two blacks who will be promoted are considered qualified in band "A", the highest band. In addition, the four proposed promotions are not intended to set employment percentage goals or ensure a racially balanced work force. *In re Birmingham Reverse Discrimination Emp. Lit.,* 20 F.3d at 1547. There is no evidence that the promotions were under-inclusive. Fourth and finally, the proposed agreement does not prevent whites from being promoted to sergeant or lieutenant; in fact, two white males are to be promoted, one to the rank of sergeant and one to lieutenant. The promotions of the black officers will not cause the layoff of any white officers and, at most, will merely delay the opportunity for advancement of those white officers not chosen for promotion.[21]

21. Admittedly, as the Sims plaintiffs and the Scott intervenors argue, the Fifth, Sixth, and Tenth Circuit Courts of Appeals have held that "a good faith settlement of a claim of past discrimination constitutes a legitimate, nondiscriminatory reason for making employment decisions." *Marcantel v. State of La., Dept. of Transp. & Dev.,* 37 F.3d 197, 202 (5th Cir.1994). *See also Carey v. U.S. Postal Service,* 812 F.2d 621 (10th Cir. 1987); *EEOC v. McCall Printing Corp.,* 633 F.2d 1232 (6th Cir.1980). These cases, however, are not clear as to when a settlement is immune from a third-party attack because it is "a good faith settlement" and when a settlement must be subjected to "strict scrutiny" to withstand such an attack. Perhaps a distinction can be drawn between individual claims brought by one person and those brought by several persons, or between individual claims and class claims, or between individual relief and systemic relief. The court

cannot say, however, that these differences, although existing in fact, logically and equitably warrant differences in treatment. Perhaps the best answer to the problem is that in *Marcantel, Carey,* and *McCall,* the appellate courts were essentially applying strict scrutiny analysis in concluding that the settlements were entered into in "good faith" and thus were not subject to attack from adversely affected third parties. For example, in *Marcantel,* the Fifth Circuit Court, while noting the "the negative impact on other employees," 37 F.3d at 201, wrote:

"This Court is convinced that the consideration of a conciliation agreement which results in a consent decree as an act of discrimination against employees not benefitted by that agreement would create a situation in which each settlement would spark new rounds of litigation, settlement of claims would be discour-

The court therefore finds the proposed agreement settling objections to the Montgomery County Sheriff's Department's 1993 selections for promotion to sergeant and lieutenant in the department's law enforcement division is narrowly tailored to meet a compelling governmental interest.

An appropriate judgment will be entered.

## JUDGMENT

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That the objections to testing procedures, etc., filed by the Dodson intervenors on October 22, 1993, are overruled;

(2) That the petition to set objective race and sex neutral testing, etc., filed by the Dodson intervenors on October 22, 1993, is denied;

(3) That the objections to 1993 selections for promotion to sergeant and lieutenant, etc., filed by the Sims plaintiffs and the Scott intervenors on December 21, 1993, are overruled as moot;

(4) That the motion to enjoin, etc., filed by the Sims plaintiffs and the Scott intervenors on December 21, 1993, is denied as moot;

(5) That the joint motion for approval of agreement to settle objections regarding 1993 selections for promotion to sergeant and lieutenant, etc., filed by the Sims plaintiffs, the Scott intervenors, and the defendants on October 20, 1994, is granted and that said agreement is approved; and

(6) That the further objections to 1993 selections procedures, filed by the Dodson intervenors on October 24, 1994, are overruled.

It is further ORDERED that costs are taxed against the defendants and the Dodson intervenors, for which execution may issue.

aged, and the courts would be continually faced with stale claims.

.       .       .       .       .

"We conclude that a good faith attempt by an employer to remedy past discrimination by entering a settlement agreement not only successfully meets the challenge of a prima facie case but is not an independent discriminatory act against employees not parties to the agreement but adversely affected by it. Any other decision would discourage settlement and hamper employers in their attempts to redress past discrimination.

.       .       .       .       .

"This Court has noted previously that some latitude should be given to courts and employers attempting to correct past acts of discrimination. 'The law is well settled that relief under Title VII cannot be denied simply because the interests of some employees will be negatively affected....' Rather, '[a]dequate protection of ... rights under Title VII may necessitate ... some adjustment of the rights of ... [other] employees. *202 The Court must be free to deal equitably with conflicting interests of ... employees in order to shape remedies that will most effectively protect and redress the rights of the ... victims of discrimination.'

.       .       .       .       .

"Finally, the plaintiff attempts to rely on the Supreme Court's decision in *Regents of the University of California v. Bakke* [438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978)] to make out his claim of reverse discrimination. The *Bakke* case dealt with an affirmative action program that set aside a specific number of positions for African–Americans. Thus, applicants who were not African–Americans were wholly precluded from competing for those positions, solely on the basis of race. The case before us is distinguishable from the *Bakke* decision: here Marcantel was not precluded from applying for the Highway Maintenance Superintendent position because he was not a member of a specified race. All potential applicants were affected regardless of their race."

37 F.3d at 201–202 (citations and footnotes omitted). Therefore, the more narrow the scope of the settlement and the more limited its impact on third parties, the more easily the settlement should pass a strict scrutiny analysis; and, conversely, the broader the scope and the greater the impact, the more difficult it may be for a settlement to pass strict scrutiny. The difference, for the purpose of strict scrutiny, between the proposed settlement now before this court and those before the courts in *Marcantel*, *Carey*, and *McCall* may be evidenced not by a bright line but by a continuum.

In any event, this court need not reach this issue because the proposed agreement submitted by the Sims plaintiffs, the Scott intervenors, and the defendants withstands strict scrutiny.