Clara SIMS, et al., Plaintiffs,

W.T. Scott, et al., Plaintiff–Intervenors,

v.

MONTGOMERY COUNTY COMMISSION, et al., Defendants,

Albert B. Dodson, et al., Defendant–Intervenors.

No. CIV.A. 3708–N.

United States District Court, M.D. Alabama, Northern Division.

June 9, 1998.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

Three years ago, in the twenty-second year of this litigation, the court wrote the following:

> "The court ... believes that it is now time that the parties contemplate an end, in the near future, to this litigation to the extent that it involves the Montgomery County Sheriff's Department and its officials. 'Otherwise,' as this court has previously stated, '[this litigation] will give a literal meaning to the figurative comment this court made a number of years ago, in another lawsuit, that "Unlike old soldiers, cases such as the one now before the Court not only never die, they never fade away." ' *United States v. City of Montgomery*, 775 F.Supp. 1450, 1460 (M.D.Ala.1991) (quoting *United States v. Frazer*, 1976 WL 729, 14 Empl. Prac. Dec. (CCH) ¶ 7599 at 4929 (M.D.Ala.1976))."

*Sims v. Montgomery County Comm'n*, 890 F.Supp. 1520, 1534–35 (M.D.Ala.1995), *aff'd*, 119 F.3d 9 (11th Cir.1997) (table). That time has now arrived not only as to the Montgomery County Sheriff's Department but as to all Montgomery County departments and agencies that have been the subject of this litigation. In response to a request made by the court on October 29, 1997, the defendants

have moved for termination of this 25–year–old class-action lawsuit, in which African–American citizens charged the defendants (the Montgomery County Commission, the Montgomery City–County Personnel Board, and others) with race discrimination. Based on the evidence presented, the court concludes that the motion should be granted.

## I. BACKGROUND

This lawsuit has a long and complex history. Nevertheless, a general overview is necessary for proper consideration of the pending motion for termination.

### A. The 1973 Plan

On June 26, 1972, plaintiffs Clara Sims and Ella Bell, on behalf of a class of black county employees, filed a complaint against the defendants, charging that they had engaged in a pattern and practice of racial discrimination in violation of the fourteenth amendment to the United States Constitution, as enforced through 42 U.S.C.A. § 1983. Almost a year later, on March 22, 1973, the court approved and adopted a plan which provided for extensive systemic relief. The 1973 plan contained general prohibitions against race discrimination in all departments of Montgomery County. The plan also identified three major areas for redress:

- First, the plan provided for review of the work performed by county employees to determine whether reclassification of jobs was necessary to provide more equal wages and benefits for the performance of equal or substantially similar work. As part of that review, all 'unclassified laborers' became 'classified laborers.' The reclassification entitled these employees to all rights and benefits received by other classified employees. In addition, the promotion possibilities from the labor service were greatly expanded.
- Second, the plan addressed recruitment practices, minimum qualifications and standards, and selection procedures for entry-level jobs and promotions in all departments. The plan provided for enhancement of recruitment targeted at African–Americans, and the plan required that the standards and procedures used for jobs in all departments meet federal and state-law requirements. New eligibility lists were created for all jobs throughout the county for which the City–County Personnel Board maintained such lists.
- Third and finally, the defendants were required to maintain recruiting records, employment advertisements, applications, and other employment records, which were then to be available for review by the plaintiffs. The defendants were required to submit to the court semiannual reports which set forth the work-force representation of all African–Americans and other employees in all job categories of the county, the number of individuals, by race, hired into each such job category during the reporting period, and the number of individuals hired into and promoted from classified laborer positions during that period.

The 1973 order approving the plan stated that the court would retain jurisdiction for purposes of modification of the order, including the terms of the 1973 plan, and for issuing such further orders as might be appropriate. The order also provided that, at the defendants' request, the plan could be dissolved after five years and that, in considering whether to dissolve the plan, the court was to take into account whether the defendants have substantially complied with the plan and whether the basic objectives of the plan have been achieved.

Apart from the Montgomery County Sheriff's Department, there has been little to no activity with regard to the all county departments. On April 22, 1981, the court allowed Yvetta Martin and five other persons to intervene as party plaintiffs, to seek relief against the Judge of Probate and Chief Clerk. By judgment and order entered July 1, 1982, the court ordered those defendants to appoint two of the plaintiff-intervenors to permanent probate clerk positions and to pay backpay to four of the plaintiff-interveners. *See Sims v. Montgomery County Comm'n,* 544 F.Supp. 420 (M.D.Ala.1982). On December 12, 1985, Vernon Johnson and Alvin T. Rowell moved to intervene as plaintiff-interveners, and, on January 2, 1986, the court denied that motion to intervene, opining that "it is time that the present lawsuit[ ] come to rest"; the court noted that Johnson and Ro-

well could, in a separate lawsuit, still seek enforcement of any injunction in the present lawsuit. Except as to the Sheriff's Department, the plaintiffs have not otherwise sought further relief or complained that the defendants were not in compliance with 1973 plan and outstanding orders.

### B. The November 1990 Injunction

On May 26, 1988, four African–American deputies—W. T. Scott, Melvin Turner, Addie Berry, and Cinda Brown—moved to intervene in this litigation. These officers, collectively called the 'Scott intervenors,' charged that the Montgomery County Sheriff's Department was continuing to discriminate against black employees in violation of the following: the 1973 plan; Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 1981a, 2000e through 2000e–17; and the fourteenth amendment, as enforced through 42 U.S.C.A. § 1983. On November 2, 1988, the court certified a plaintiff-intervenor class of all "black persons who are past, current, and future employees of the Montgomery County Sheriff's Department."

As a result of this round of litigation, on November 27, 1990, the court found that the Sheriff's Department was continuing to discriminate against its African–American officers, *see Sims v. Montgomery Cty. Comm'n,* 766 F.Supp. 1052 (M.D.Ala.1990), and the court entered a permanent injunction prohibiting the department from further racial discrimination and requiring the department to change its personnel procedures. *Id.* With this November 1990 injunction, the court ordered specific affirmative relief for two of the Scott intervenors, including a transfer, back pay, and retroactive benefits for plaintiff-intervenor Scott, and a promotion, back pay and retroactive benefits for plaintiff-intervenor Turner. *Id.* The court also required that the department fashion, by an established deadline, new, nondiscriminatory procedures regarding promotions, discipline, transfers and job assignments. *Id.*[1]

### C. The Dodson Intervenors

On November 27, 1990, the court also permitted a group of white male deputies, collectively called the 'Dodson intervenors,' to intervene in this litigation. On May 18, 1992, the court certified the Dodson intervenors as a class for the purpose of challenging promotion procedures within the department only. On December 29, 1994, the court granted summary judgment for the defendants, rejecting the Dodson intervenors' claims that the department in 1988 had promoted black deputies to law enforcement sergeant instead of white deputies on the basis of race, in violation of federal law. *See Sims v. Montgomery County Commission,* 873 F.Supp. 585 (M.D.Ala.1994).

### D. The Sheriff's Manual of Policies and Procedures

On May 7, 1991, the department submitted to the court for review and approval a proposed Manual of Policies and Procedures for the Montgomery County Sheriff's Office. The Manual was offered to satisfy the requirements, set forth in the November 1990 injunction, that the department adopt a permanent plan to redress racial harassment and provide nondiscriminatory procedures regarding discipline, transfers, and job assignments. *See Sims v. Montgomery Cty. Comm'n,* 766 F.Supp. at 1101–02. By order and injunction entered July 25, 1991, the court approved the Manual and ordered the department to implement the Manual forthwith.

### E. Promotional Procedures

In January 1992, again as required by the November 1990 injunction, the Sheriff's Department submitted new, nondiscriminatory interim promotion procedures, and these procedures were approved by the court on January 13, 1992. The interim plan did not establish policies and procedures for promotions, but instead provided for procedures by which African–Americans in the department could

---

**1.** In that same order entered on November 27, 1990, in a companion case that was consolidated with this case, *Williams v. Montgomery County Sheriff's Department,* 766 F.Supp. 1052 (M.D.Ala. 1990) (which was originally brought by Lois Johnson and styled *Johnson v. Montgomery County Sheriff's Department*), the court found that the Sheriff's Department was also discriminating against female officers, and the court ordered similar relief for these officers. *See Sims v. Montgomery Cty. Comm'n,* 766 F.Supp. at 1061–80. For more background on the *Williams* litigation, *see, e.g., Sims v. Montgomery County Comm'n,* 934 F.Supp. 1314 (M.D.Ala.1996), and *Sims v. Montgomery County Comm'n,* 873 F.Supp. 585 (M.D.Ala.1994).

file objections within seven days to the specific promotion selections later made under this interim plan if the promotion procedures would "result in adverse impact against a protected class or otherwise violate the rights of a protected class under an outstanding Court order."[2] In January 1994, the department submitted new, nondiscriminatory permanent promotion procedures. The final version of those procedures was submitted on October 20, 1994, with the agreement of all parties except the Dodson intervenors, and, on December 7, 1994, and July 3, 1995, these procedures too were approved by the court. *See Sims v. Montgomery County Commission,* 890 F.Supp. 1520 (M.D.Ala. 1995), *aff'd,* 119 F.3d 9 (11th Cir.1997) (table).

### F. Objections to 1993 Promotions

On December 21, 1993, the plaintiffs and the Scott intervenors objected, under the interim promotion procedures, to the Sheriff's Department's proposed promotion of two white males to the ranks of deputy sheriff sergeant and lieutenant, respectively, and moved to enjoin the promotions. The defendants agreed not to carry out the promotions pending court resolution of the objections. On October 20, 1994, the plaintiffs, the Scott intervenors, and the defendants jointly moved for approval of an agreement settling the plaintiffs' and the Scott intervenors' objections to the 1993 selections for sergeant and lieutenant. On October 24, 1994, the Dodson intervenors objected to the proposed settlement, contending it was an illegal "agreement to promote two African Americans over more qualified white Americans even though not required under adverse impact."[3] On May 19, 1995, the court overruled the Dodson intervenors' objections and approved the proposed settlement. *See Sims v. Montgomery County Commission,* 887 F.Supp. 1479 (M.D.Ala.1995), *aff'd,* 119 F.3d 9 (11th Cir.1997) (table).

### G. 1997 Motion for Termination

At the end of the memorandum opinion entered July 3, 1995, giving reasons for approval of the permanent promotion plan, the court, as stated, wrote the following: "The court ... believes that it is now time that the parties contemplate an end, in the near future, to this litigation to the extent that it involves the Montgomery County Sheriff's Department and its officials." *Sims,* 890 F.Supp. at 1534. The court explained that, "A court's end purpose in institutional litigation, such as this, is to remedy the violation and then to restore to local or state authorities complete control of the institution operating in compliance with federal law. *Missouri v. Jenkins,* 515 U.S. 70, 97–98, 115 S.Ct. 2038, 2054, 132 L.Ed.2d 63 (1995); *Freeman v. Pitts,* 503 U.S. 467, 489, 112 S.Ct. 1430, 1445, 118 L.Ed.2d 108 (1992)." *Sims,* 890 F.Supp. at 1534–35. By separate order entered that same date, the court ordered that "all parties show cause, if any there be, in writing by July 17, 1995, as to why this court should not impose as a requirement, separate from the jointly submitted and court-approved proposed permanent promotion plan, that all claims against the department and its officials will be dismissed on December 31, 1997, unless on or before said date a party to this litigation requests in writing that the litigation be extended." No party offered any cause at that time why this litigation should not be dismissed against the Sheriff's Department and its officials as of the end of 1997.

On September 12, 1997, in furtherance of the court's intention to dismiss the litigation against the Sheriff's Department and its officials by the end of December 1997, the court directed the parties to file a joint report, by October 7, 1997, "indicating the current status of this litigation and whether the parties anticipate that this litigation will be ready for termination on December 31, 1997, and, if not, why." However, after the parties' submission of the joint status report, the court entered an order on October 29, 1997, directing the dismissal of this litigation *not* as to the Sheriff's Department but rather the dismissal as to all agencies and departments other than the Sheriff's Department. The court directed the defendants to file, within 14 days "a motion for the termination of th[is] litigation, with th[is] litigation viewed

---

**2.** Joint petition for approval of interim plan, filed January 7, 1992, at ¶ 1.

**3.** Dodson intervenors' brief, filed on November 8, 1994, at 8.

as separate from the Scott[-intervnor] litigation."

On November 12, 1997, the defendants filed a motion to terminate this litigation, which the court set for final hearing on April 9, 1998. The court required the defendants to give notice to all plaintiff class members of the following: the proposed termination, the deadline for asserting objections to the proposed termination, and the hearing on those objections scheduled for April 9. This notice was accomplished in three ways. First, the defendants gave actual notice to all, or virtually all, current county employees by furnishing a copy of the court-approved notice to each employee either in person or by mail, with the employee's paycheck issued on February 27, 1998. The few employees who did not receive paychecks for that pay period were later mailed a copy of the notice.[4] Second, a copy of the notice was posted in conspicuous places on bulletin boards in the various county departments, as well as on bulletin boards in public areas in the county courthouse annex building.[5] Finally, because the plaintiff class is not necessarily limited to current county employees, the notice was published once a week for three consecutive weeks in the Montgomery Advertiser and the Montgomery–Tuskegee Times, beginning March 1, 1998, and February 26, 1998, respectively.[6]

Later, however, in response to inquiries from counsel, the court added that the proposed termination would apply to the Sheriff's Department (that is, the Scott intervenors) as well. The defendants then served a supplemental notice—stating specifically that the proposed termination would terminate the Scott litigation as well—on all Sheriff's Department employees, either personally or, in the case of the few employees on military or other leave, by mail.[7]

■ The court conducted a fairness hearing on April 9, 1998. The court received a total of twelve or so written and oral objections to the proposed dismissal of this action. The court concludes, as a threshold matter, that the notice and fairness hearing were sufficient under the Civil Rights Act of 1991. *See* 42 U.S.C.A. § 2000e–2(n)(1). The notices advised recipients that their employment opportunities with the county might be affected; they advised of the date, time, and place of the fairness hearing and the deadline for filing objections to the proposed termination; and they included specific information about how to present objections in writing and at the fairness hearing. The notices and fairness hearing were adequate to inform all county employees (including Sheriff's Department employees) and other affected persons about the proposed termination of this litigation and to solicit and determine their views.

## II. DISCUSSION

### A. Dissolution Requirements

■ In addressing the proposed termination of longstanding litigation involving the City of Montgomery Police Department, this court explained: "It goes without saying the local autonomy of [law enforcement agencies] is a 'vital national tradition.' *Freeman v. Pitts,* 503 U.S. 467, 490, 112 S.Ct. 1430, 1445, 118 L.Ed.2d 108 (1992) (quoting *Dayton Bd. of Education v. Brinkman,* 433 U.S. 406, 410, 97 S.Ct. 2766, 2770, 53 L.Ed.2d 851 (1977)). Returning governmental entities to the control of local authorities 'at the earliest practicable date is essential to restore their true accountability to our governmental system.' *Id.* Therefore, in addressing any statutory or constitutional violation by a police department or any other local governmental entity, a court's 'end purpose' must be to remedy the violation and then to restore authority to the local entity that is 'operating in compliance' with federal, state and constitutional law. *Id.*" *United States v. City of Montgomery,* 948 F.Supp. 1553, 1563 (M.D.Ala.1996).

The 1973 plan does not identify a particular standard by which the court is to determine whether and when the objectives of the plan have been accomplished, nor any specif-

---

4. *See* Joint Evidentiary Record, filed March 31, 1998: tab 1, affidavit of Carolyn Nash.

5. *See id.:* tab 2, affidavit of David Mitchell.

6. *See id.:* tab 4, affidavit of Sherry Herring (Montgomery Advertiser); *id.:* tab 5, affidavit of Almaria Dixon Smith (Montgomery–Tuskegee Times).

7. *See id.:* tab 3, affidavit of N.W. Ward.

ic goals or timetables for compliance. Rather, ¶ 4 of the order adopting the 1973 plan stated that, "at any time after five years subsequent to the date of entry of this order, the defendants or any of them may move this Court, on due notice, for dissolution of this order, and in considering whether the order shall be dissolved, the Court will take into account whether Defendants have substantially complied with this order and whether the basic objectives of this order have been achieved." On the other hand, the court's November 1990 injunction did establish specific deadlines, at least for defendants' submission of temporary and permanent plans, to redress racial harassment in the Sheriff's Department and for submission of new, nondiscriminatory procedures regarding promotions, discipline, transfers, and job assignments.

■ In making the determination of whether to terminate relief and restore full control to a governmental entity, a court should be informed by, at least, the following three considerations: first, whether there has been full and satisfactory compliance with the court's outstanding orders; second, whether retention of judicial control is necessary or practical to achieve compliance with any outstanding orders; and third and finally, whether the governmental entity has demonstrated to the public and to those of the disfavored group its good faith commitment to the whole of the court's orders and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance. *Freeman,* 503 U.S. at 491, 112 S.Ct. at 1446 (articulating these factors in the context of a long-standing school desegregation case). In considering these factors, a court should give particular attention to the governmental entity's 'record of compliance.' *Id.* A local government is better positioned "to demonstrate

its good-faith commitment" to a constitutional course of action when its policies exhibit a consistent pattern of lawful conduct directed at eliminating earlier violations. *Id.*

## B. Defendants' Compliance with the 1973 Plan and the November 1990 Injunction

■ The evidence reflects, based on the information provided in reports submitted over the last 25 years, that the basic objectives of the 1973 plan have been achieved. Many of the plan's requirements relating to classification, such as changes in wages and benefits for laborers, took place near the time the plan was entered in 1973.[8] Other systemic changes, such as increased promotion opportunities from the labor services following reclassification, have now been available to employees for approximately 20 years or more, and the procedures which were established to notify potential applicants of openings in all departments are incorporated in the defendants' standard recruitment and hiring processes.[9] The defendants have consistently maintained records and submitted timely reports as required. The defendants' recruiting efforts have resulted in proportionately greater numbers of African–American applicants.[10]

The defendants have submitted evidence of the current racial composition of covered positions in the various county departments, and they contend that it "reflect[s] the implementation of policies and procedures which foster equal employment and promotional opportunities."[11] The court agrees. Indeed, the reports submitted by defendants to the court reflect a significant increase in the number and percentage of African–Americans in the workforce across the various departments of the county over the life of this litigation.[12]

---

8. *See id.:* tab 6, affidavit of Barbara Montoya at 2.

9. *Id.* at 2–3.

10. *Id.*

11. *Id.* at 3.

12. *Id.; see also id.* at attached Exhibits A, B and C. The parties have not submitted evidence

whether hiring and promotional decisions across the various departments, other than the Sheriff's Department, have been made without adverse impact or pursuant to validated procedures. Because the plaintiff class has not raised such a contention and no complaint has ever been brought in this action of a violation in that regard, the court makes no finding concerning lack of adverse impact, nor validation of hiring and promotion procedures, other than in the Sheriff's Department, as discussed below.

The defendants have offered evidence of their compliance with the various requirements, both affirmative and negative, of the November 1990 injunction. That evidence reflects that the defendants, specifically the Montgomery County Sheriff and his officials, have complied with all of the injunction's requirements.

With respect to the affirmative relief for the Scott intervenors, the record reflects that the defendants have removed from plaintiff-intervenor Scott's personnel file the disciplinary (in which he had been charged with commenting to another officer during jury selection that he believed a juror had a criminal record). The Montgomery County Sheriff offered, and Scott accepted, a transfer to the investigation unit in the law enforcement division, retroactive to the point in time when he requested a transfer, and the defendants paid Scott all appropriate backpay and retroactive benefits.[13] Similarly, the Sheriff promoted plaintiff-intervenor Turner to captain, retroactive to 1983 with all appropriate back pay and benefits, and transferred Turner to the enforcement division, where he currently serves as commander of the patrol division.

The defendants have also submitted evidence showing numerous steps they have taken to comply with the November 1990 injunction's requirements for systemic affirmative relief. On or about May 7, 1991, the defendants submitted a proposed Manual of Policies and Procedures for the Sheriff's Office (drafted by the Center for Business and Economic Development of Auburn University at Montgomery with significant input from the Sheriff's Office and all counsel) to satisfy the requirements of a permanent plan to redress racial harassment, and to provide nondiscriminatory procedures regarding discipline, transfers, and job assignments in the Sheriff's Office.[14] As noted above, on July 25, 1991, the court approved the Manual and ordered the Montgomery County Sheriff to implement the Manual forthwith. By ap-

proximately October 1991, all employees in the Sheriff's Office had received a copy of the Manual and orientation training in all aspects of the policies and procedures contained in the Manual; and all employees hired in the Sheriff's Office since then have likewise received a copy of the Manual and been trained in all aspects of the policies and procedures contained therein.[15] In addition, since 1991, all employees in the Sheriff's Office have received regular training in preventing racial harassment. The Manual makes clear that racial harassment and discrimination are against the Sheriff's Office policy, and all employees are regularly so instructed.[16]

The evidence reflects that since the Manual was ordered implemented in July 1991, the Montgomery County Sheriff and his subordinates have adhered to the nondiscriminatory procedures set out in the Manual, specifically including but not limited to the procedures regarding discipline, transfers, and job assignments, and the prohibitions against racial harassment.[17] Since implementation of the Manual and the initial training on racial harassment, Sheriff's Department employees have made only a few, isolated complaints of race discrimination. Each of those complaints was investigated, as with other complaints of a violation of Sheriff's Department policy, in accordance with the procedures of the Manual.[18] When there has been any evidence substantiating a complaint, the complaint has been taken before a departmental Review Board, which routinely contains at least one African-American member. There is no evidence that any of those complaints was deemed founded by the Review Board; and the court also credits the Montgomery County Sheriff's testimony that if such a complaint had been sustained, he would have taken appropriate disciplinary action in accordance with the Progressive Discipline Guidelines in the Manual.[19]

---

**13.** Plaintiff-intervenor Scott has since been promoted through the ranks to lieutenant, pursuant to the validated promotional procedures used by defendants since the late 1980's, and is currently in charge of juvenile investigations.

**14.** Joint Evidentiary Record filed March 31, 1998: tab 7, affidavit of Dan Jones at 2.

**15.** *Id.* at 3.

**16.** *Id.*

**17.** *Id.*

**18.** *Id.*

**19.** *Id.*

With respect to promotional relief, at all times since the November 1990 injunction (and since at least approximately 1988), the Montgomery County Sheriff has made promotional selections based on selection procedures validated under the Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. Part 1607, and developed by the Center for Business. Until approval of the permanent promotion plan, the Sheriff made promotions so as to avoid adverse impact based on race, to the extent required by the 1973 plan and permitted by law.[20]

Although the November 1990 injunction does not address hiring practices, the 1973 plan does. With respect to hiring decisions made by the Sheriff, the evidence shows that at least since the current Sheriff took office in January 1991, he has made hiring selections for entry-level positions (i.e., deputy sheriff trainee and deputy sheriff, correctional officer trainee and correctional officer) based on validated procedures recommended by the Center for Business. The Sheriff made those selections so as to avoid adverse impact based on race to the extent required by the 1973 plan and permitted by law.[21] The Sheriff likewise testified that he anticipates continuing to make hiring selections for entry-level positions based on validated procedures; to continue, to the extent those procedures cannot be validated, to take adverse impact information into account to the extent required by law; and to continue to make hiring selections without regard to race. Therefore, since he assumed office in 1991, the current Sheriff has complied with the hiring requirements of the 1973 plan; and, particularly, given the absence of any evidence of any discrimination by him in entry-level hiring, the court credits his testimony concerning his record and his good-faith intent to comply with the law.[22]

On or about October 20, 1994, the Montgomery County Sheriff joined with the other defendants, the plaintiffs, and the Scott intervenors, in submitting for court approval a permanent promotion plan for the ranks of sergeant, lieutenant, and captain in both the corrections and law enforcement divisions in the Sheriff's Department.[23] Since approval of the permanent plan on December 7, 1994, the Sheriff has taken adverse impact into account in making promotional selections to the extent required by the permanent promotion plan and other law.[24] The Sheriff has indicated his intent to continue making promotional selections based on validated selection procedures; to continue, to the extent the selection procedures cannot be validated, to take adverse impact information into consideration to the extent required by law; and to continue to make promotional selections without regard to race.[25] As shown by the reports submitted by the defendants, the Sheriff's nondiscriminatory hiring and promotions policies are directly reflected in the significant increase in the number and percentage of African–Americans at all ranks. There is no evidence that the Sheriff has discriminated against any person in promotions based on race, and the court again credits his testimony concerning his record and his good-faith efforts to comply with the law and his own policy.

The court must admit, however, that it is troubled by some of the evidence submitted by the parties. The Montgomery County Sheriff's Department is divided in two divisions: corrections and law enforcement. The corrections division is responsible for the operation of the Montgomery County Detention Center, also known as the county jail; the law enforcement division is also known as the field division. The racial composition as found in the November 1990 memorandum opinion was as follows: as of 1988, in a county with over 30% black population, no black person had ever been promoted in law enforcement, the much more prestigious side of the department; only five black persons had been promoted on the corrections side, that is, the jail side; and 77% of corrections officers were black, while only 19% of officers in enforcement were black. *Sims v. Montgomery County Comm'n,* 766 F.Supp. at 1085. Admittedly, there has been great im-

---

20. *Id.:* at 4.

21. *Id.*

22. *Id.*

23. *Id.* at 3.

24. *Id.* at 4.

25. *Id.*

provement in desegregating the law enforcement side: as of September 30, 1997, on the law enforcement side, one of four captains, three of nine lieutenants, three of twelve sergeants, and 38 of 84 deputy sheriffs were African–American. The same cannot be said about the corrections side, however: on the corrections side, there was only one captain and he was white, and five of six lieutenants, eight of ten sergeants, and 50 of 56 correctional officers were African–American.[26] Thus, the corrections side of the department remains predominantly African–American. In addition, although the law enforcement side has African–Americans in all its major parts, the court security division—which is the least prestigious of the corrections divisions, because it offers the least opportunity to assume responsibility and show capability—is almost all African–American. The evidentiary record, however, convincingly shows that the concentration of African–Americans in these areas is solely the result of their own choices.[27] Counsel for the plaintiffs and the Scott interveners has met with African–American deputies, and has been informed by them that they do not want to be moved and that they are where they are by personal and individual choice.[28] Therefore, absent an effort by the court to single out these officers solely because of their race and challenge their separate choices, there is no way to redress these circumstances, assuming the circumstances warrant redressing by a court. The court agrees with counsel for the plaintiffs and the Scott interveners that such race-conscious relief is not justified here.

Finally, the November 1990 injunction ordered a halt to specified discriminatory practices found by the court, including the Sheriff Department's policy of assigning patrol cars and neighborhoods based on officers' race, racial harassment of African–American officers in the department, and racial discrimination and retaliation against two of the named Scott intervenors (Addie Berry and Cinda Brown). The Sheriff testified that he ordered all such practices stopped, and there is no credible evidence before the court of any ongoing or post–1990 discrimination in any of those areas. Indeed, as noted above, there have been only isolated complaints of racial harassment and discrimination, none of which was deemed founded by a racially diverse departmental Review Board. Moreover, the only post–1990 attempt by the Scott intervenors to enforce any relief under the 1973 plan or the November 1990 injunction came in the form of an objection to the "within band" procedures used by the Sheriff for making two promotional selections in late 1993; those objections were settled without any finding of discrimination on the part of the Sheriff. Accordingly, the court finds that the defendants have complied with all requirements imposed by the November 1990 injunction.

### C. Objections to Termination of this Litigation

Approximately 660 officials and employees of Montgomery County and related agencies received notice, by hand-delivery or mail, of the proposed termination of this litigation.[29] In addition, as noted above, notice was posted on bulletin boards in the county courthouse annex and various county department, and published in the Montgomery Advertiser and the Montgomery–Tuskegee Times for three consecutive weeks.[30] In response, only twelve persons filed objections to the proposed termination of this action.[31]

Several of the objections raise only vague and general complaints that reflect concern more with cessation of court control than with any particular pattern of conduct or even any specific individual instance in which the defendants allegedly have not complied with the requirements of the 1973 plan or the November 1990 injunction. Accordingly,

---

26. *Id.:* tab 6, affidavit of Barbara M. Montoya, exhibit C.

27. *See* transcript of supplemental hearing held April 21, 1998.

28. *Id.*

29. *See* Joint Evidentiary Record, filed March 31, 1998: tab 1, affidavit of Carolyn Nash, exhibits A, B and C.

30. *See id.:* tab 2, affidavit of David Mitchell; *id.:* tab 4, affidavit of Sherry Herring; *id.:* tab 5, affidavit of Almaria Dixon Smith.

31. *See id.:* tab 8 (collected objections).

these objections present nothing for the court to review.

Six current employees of the Montgomery County Sheriff's Department have filed somewhat specific objections to the termination of this litigation.[32] A few of the objections assert complaints to the outcome of the Sheriff's transfer-and-job-assignment procedures, adopted as part of the Sheriff's Manual, in response to the November 1990 injunctive requirement that the Sheriff develop nondiscriminatory procedures for transfers and job assignments. The evidence shows that the outcomes about which these objectors complain result directly from the Sheriff's neutral, even-handed application of those procedures. With respect to any other complaints, it suffices to note that none of the objectors has attempted to raise any of the complaints through the departmental grievance procedures, sought to intervene in this action, filed a separate civil action, or filed a charge of discrimination with the Equal Employment Opportunity Commission concerning the substance of the objection. None of the objections adequately identifies any systemic violation of the 1973 plan or the November 1990 injunction so as to controvert the evidence of the defendants' substantial compliance with the requirements of the plan and the injunction. If any of the objectors has a viable claim (an issue the court declines to address here), he or she may pursue that claim through a separate action.

### III. CONCLUSION

Relying on the above observations, the court agrees with the defendants that there has been full compliance with the 1973 plan and the November 1990 injunction. The first factor—whether there has been full and satisfactory compliance with the court's outstanding orders—has been satisfied. The second and third factors—whether retention of judicial control is necessary or practical to achieve compliance with outstanding orders, and whether the governmental entity has demonstrated to the public and to those of the disfavored group its good-faith commitment to these orders—have been satisfied as well.

The court concludes that it is time to return its remaining control over the personnel practices of the county to the defendants, subject, of course, to the usual methods of maintaining accountability inherent in a democratic system. The court accordingly agrees with the defendants that the 1973 plan and the November 1990 injunction are due to be dissolved, and this litigation is due to be dismissed in its entirety. An appropriate judgment will be entered.

---

32. Even most of these "somewhat specific" objections do not identify specific instances in sufficient detail to enable defendants to respond other than generally.