Johnny **REYNOLDS**, et al., Plaintiffs,

v.

**ALABAMA DEPARTMENT OF TRANSPORTATION**, et al., Defendants.

No. Civ.A. 85–T–665–N.

United States District Court, M.D. Alabama, Northern Division.

Jan. 23, 1998.

Robert L. Wiggins, Jr., Ann K. Wiggins, Russell W. Adams, Abigail P. Van Alstyne, Kimberly C. Page, Scott Gilliland, and Kell A. Simon, Gordon, Silberman, Wiggins & Childs, Birmingham, AL, for Johnny Reynolds, plaintiff, and Cecil Parker, Frank Reed, Ouida Maxwell, Martha Ann Boleware, Florence Belser, Peggy Vonsherie Allen, and Jeffrey W. Brown, intervenor-plaintiffs.

Claudia H. Pearson, Nakamura & Quinn, Birmingham, AL, for Robert Johnson, intervenor-plaintiff.

Raymond P. Fitzpatrick, Jr., R. Scott Clark, J. Michael Cooper, Fitzpatrick, Cooper & Clark, Birmingham, AL, for William Adams, Cheryl Caine, Tim Colquitt, William Flowers, Wilson Folmar, George Kyser, Becky Pollard, Ronnie Pouncey, Terry Robinson, Tim Williams, intervenors.

Raymond P. Fitzpatrick, Jr., R. Scott Clark, J. Michael Cooper, Fitzpatrick, Cooper & Clark, Birmingham, AL, for Michael Grant, John D'Arville, and Andrew McCullough, intervenors.

Thomas R. Elliot, Jr., Allen R. Trippeer, Jr., Lisa W. Borden, C. Dennis Hughes, London & Yancey, Birmingham, AL, and William H. Pryor, Jr., Atty Gen. for the State of Alabama, Montgomery, AL, for Alabama. Dept. of Transp., Alabama State Personnel Dept., Jimmy Butts, in his official capacity as Director for Alabama Dept. of Transp., Halycon Vance Ballard, in her official capacity as Director of the Alabama State Personnel Dept., and Fob James, in his official capacity as Governor of the state of AL, defendants.

William P. Gray, Jr., Gray & Jauregui, Montgomery, AL, for Fob James, in his official capacity as Governor of the State of Alabama, defendant.

Elaine R. Jones, Norman J. Chachkin, NAACP Legal Defense Fund, New York, NY, for NAACP Legal Defense and Educational Fund, Inc., amicus.

Barbara R. Arnwine, Thomas J. Henderson, Richard T. Seymour, Teresa A. Ferrante, Lawyers' Committee for Civil Rights Under Law, Washington, DC, for The Lawyers' Committee for Civil Rights under Law, amicus.

## ORDER AND INJUNCTION

MYRON H. THOMPSON, Chief Judge.

The issue presented, in this long-standing lawsuit in which African–American plaintiffs have charged defendants Alabama Department of Transportation and Alabama State Personnel Department with employment discrimination, is the approval and adoption of ¶ 4 of article XIII of a partial settlement reached by the parties in 1993 and submitted to the court in 1994. Paragraph 4 provides:

*"Offers of reclassification of incumbent employees to GCE:*

Black persons (a) who are employed as of the effective date of the Settlement Decree with the Highway Department in jobs other than PCE [professional civil engineer], GRE [graduate registered engineer], or GCE [graduate civil engineer], and (b) have a degree in Civil Engineering or Civil Engineering Technology will, within 90 days following the effective date of the Settlement Decree, be offered reclassification to the GCE job." [1]

The defendants and the Adams intervenors (who are non-black employees of the Transportation Department) object to ¶ 4. For the reasons that follow, the court concludes that ¶ 4 should be approved and adopted.[2]

## I. BACKGROUND

In this lawsuit, initiated in May 1985, the plaintiffs charged that the defendants discriminated against them in employment because they are African–Americans, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 1981a, 2000e through 2000e–17, the fourteenth amendment to the United States Constitution, as enforced by 42 U.S.C.A. § 1983, and 42 U.S.C.A. § 1981. The plaintiffs represent a class of African–American merit and non-merit system employees and unsuccessful applicants. The defendants include the Alabama Department of Transportation, the Alabama State Personnel Department, and several State officials. The jurisdiction of the court has been invoked pursuant to 28 U.S.C.A. § 1343 and 42 U.S.C.A. § 2000e–5(f)(3).

The parties reached a full settlement of this case in 1988, but the court refused to approve the proposed consent decree in the face of numerous objections from the members of the plaintiff class. *See Reynolds v. King*, 790 F.Supp. 1101 (M.D.Ala.1990). Litigation then resumed.

A trial was held in 1992 that extended over several months, but ended before completion when the parties announced that they might be able to settle the litigation again. In 1993, the parties reached a second, albeit only partial, settlement. In the wake of this new partial settlement, the court allowed a group of non-class members—consisting mostly of white employees of the Department of Transportation and now commonly referred to as the 'Adams intervenors'—to intervene and challenge any race-conscious provisions in the settlement. *See Reynolds v. Roberts*, 846 F.Supp. 948 (M.D.Ala.1994).

The new partial settlement was submitted to the court for approval in 1994. One part of the settlement was approved by the court and incorporated into what is now commonly known as "consent decree I."[3] The court has reserved ruling on other parts of the settlement. Paragraph 4 is contained in those parts on which the court has reserved ruling.[4]

### A.

The remedial provision in ¶ 4 of article XIII of the new settlement was based on evidence presented at trial in 1992, which reflected that the Transportation Department had intentionally refused to hire African–Americans as GCEs because of their race. The evidence was, in substance, as follows.

For the first three-quarters of this century, the State of Alabama and its agencies excluded African–Americans, because of their race, from employment other than in low and menial positions, and throughout the last quarter of this century, despite outstanding court orders, the Transportation Department manipulated, or even circumvented, State personnel procedures to avoid hiring and promotion of African–Americans into responsible and non-menial jobs.

---

**1.** Paragraph 4 is contained in what is now commonly referred to as "consent decree II." *See* motion to implement unopposed parts of proposed consent decree, filed March 7, 1994 (Doc. no. 533), attachment 2.

**2.** In addition to briefs filed in 1994 and 1996, the parties orally argued on October 3, 1997, and

January 14 and 16, 1998, issues related to the meaning and implications of ¶ 4.

**3.** *Reynolds v. Alabama Department of Transportation*, 1994 WL 899259 (M.D.Ala. March 16, 1994) (Doc. no. 553)

**4.** *See supra* note 1.

*Frazer Litigation*: In the late 1960s, the United States brought an action against the Alabama State Personnel Department challenging personnel practices which it contended intentionally discriminated against African–American applicants and employees. In 1970, in *United States v. Frazer*, 317 F.Supp. 1079 (M.D.Ala.1970), this court agreed with the United States, and found that agencies of the State of Alabama had engaged in a State-sanctioned policy of manipulating and circumventing the State's personnel procedures to avoid the hiring and promotion of African–Americans.[5] 317 F.Supp. at 1084–87. The court found intentional, pervasive, systematic exclusion and avoidance of black employees and applicants throughout numerous State departments.

The evidence demonstrated that racial discrimination was accomplished in several ways, many of which involved manipulations of personnel practices and procedures to exclude eligible and qualified black employees from competing for jobs. The evidence overwhelmingly showed refusals to hire, or even to interview, African–Americans who had qualified and appeared on the certificates of eligibles, despite an urgent and constant need to fill positions. *Id.* at 1087. It also showed that agencies maintained racially segregated facilities in their buildings. *Id.* Indeed, John S. Frazer, director of the Personnel Department, testified to his belief that the race of applicants was a legitimate factor for consideration in selecting employees. *Id.* at 1085.

The court found that "defendants' systematic refusal to appoint Negro applicants and their preference for lower-ranking white applicants constitute unlawful race discrimination[,] ... a clear violation of the equal protection clause of the Fourteenth amendment." *Id.* at 1089–91. The court entered similar findings on the defendants' recruitment and advertising practices.

The court entered an order broadly prohibiting State officials from "engaging in any employment practices, including recruitment, examination, appointment, training, promotion, retention, or any other personnel action, for the purpose or with the effect of discriminating against any employee, or actual or potential applicant for employment, on the ground of race or color." *Id.* at 1090. The court further imposed what has come to be known as the 'no-bypass rule,' which provides that State officials "shall not appoint or offer a position to a lower-ranking white applicant on a certificate in preference to a higher-ranking available Negro applicant, unless the defendants have first contacted and interviewed the higher-ranking Negro applicant and have determined that the Negro applicant cannot perform the functions of the position, is otherwise unfit for it, or is unavailable." *Id.* at 1091.

Six years later, in the same litigation, similar allegations were again before the court. The United States charged that State personnel practices were systematically and deliberately manipulated to prevent blacks from competing with white applicants for jobs and promotions. In an order entered August 1976, the court found a pattern and practice of racial discrimination in employment in the Transportation Department (then known as the Highway Department). *See United States v. Frazer*, civil action no. 2709–N, 1976 WL 729 (M.D.Ala. Aug. 20, 1976).

Specifically, the court found that the new defendants, including the Transportation Department, "avoided compliance with the decrees in this case by examining job registers maintained by the Personnel Department of the State of Alabama and by requesting certificates of eligibles only at times when no blacks were available for certification." *Id.* at *4. The court also pointed out other evidence of discriminatory practices, including maintaining registers on a non-continuous basis (establishing a register and not adding any persons until that register is exhausted and another exam is administered), or 'closing' a register for as long as two years. In this way, all-white registers were maintained.

---

5. When originally filed, this case was styled *United States v. Frazer*, civil action no. 2709–N (M.D.Ala.). In it now styled *United States v. Ballard*, civil action no. 2709–N (M.D.Ala.), because, after December 4, 1981, Halycon Vance Ballard replaced John S. Frazer as the named defendant in the case.

*Id.* at *5–*6. The court observed, "Progress toward erasing the effects of prior exclusionary practices upon the basis of race has been minimal and in many instances non-existent." *Id.* at *6.

The court also recounted the story of one black applicant's attempts to obtain a position with the State, and the elaborate lengths to which the Personnel Department went to avoid him. This occurred despite the fact that he was first on the register for the position, and that the Alabama Development Office Assistant Director found him "extremely well qualified." *Id.* at *4–*5.

The court entered a more detailed order requiring, among other things, that defendants validate all written tests. It also ordered that State officials "shall insure that blacks who are appointed to ... job classifications common to several agencies shall be appointed to all agencies in which such vacancies occur. No defendant shall attempt to avoid this provision by deferring requests for certification until blacks are unavailable." *Id.* at *7. One of the injunction's specific provisions required that the defendants "engage in intensive recruitment for black applicants for ... Graduate Civil Engineer." *Id.*

*Other Evidence Introduced at the 1992 Trial:* The Federal Highway Administration found that, during the years following the court's 1976 findings, defendants continued to engage in the same pattern and practice of racial discrimination. By use of these practices, the evidence reflected, defendants could preclude black applicants from applying for the historically white job classifications for prolonged periods, extending such exclusion into the late 1980s for some larger and more important job classifications. The most obvious of these practices, condemned and enjoined in 1976, was the refusal to permit applications for years at a time while the existing register used to fill vacancies was either all-white or predominantly white. In the 1980s, when African–Americans began to apply for positions where registers had been exhausted, applicants were suddenly subjected to a battery of new screening criteria and examinations. No evidence established that these criteria were job-related, nor validated as required by the *Frazer* injunction.

The first qualification imposed on applicants for the GCE positions, an entry level job, was that they graduate from an 'accredited' program, which eliminated graduates from most predominantly black schools. In mid–1979, however, a graduate of Southern University's accredited Civil Engineering program learned of a GCE job at the Transportation Department and attempted to apply for it. Josh Chapple testified at trial, and the Department's internal documents corroborated his testimony, that, instead of processing Chapple's application in the normal fashion according to the established criteria and procedures, both the Transportation Department and the Personnel Department subjected him to a series of delays and special requirements. Among them were: (1) a requirement that he pass the 'engineer-in-training,' also known as the 'EIT,' examination, though the defendants did not require that of white applicants; (2) a requirement that he take additional college course work in geology and transportation science before they would accept his application, though they did not post such course work on the job announcement or require it of white applicants; and (3) various other roadblocks catalogued on a daily basis in a Transportation Department internal memorandum dated November 3, 1978.[6] In another, later in-house memorandum, dated March 16, 1984, the Transportation Department's minority recruiter wrote: "[A] door to potential black GCE's from predominantly black Southern University was slammed when, on November, 1978, the qualifications which had been sufficient for many years for white GCE's were found to be unsatisfactory" for the first black applicants who satisfied them.[7]

Finally, when two African–American applicants on the register were to be hired because of the no-bypass rule of *Frazer,* and ten more African–American graduates ap-

---

**6.** Plaintiffs' supplemental memorandum in support of the goals of proposed consent decree, filed March 7, 1994 (Doc. no. 538), appendix A.

**7.** *Id.*

peared on the GCE employment register, the defendants suddenly abolished the register. The new job announcement included the EIT test as a posted requirement. The defendants, in an unabashed echo of their earlier racially discriminatory treatment of Chapple, declared the ten African–American applicants ineligible to reapply, despite their having successfully competed and ranking high enough on the register to be selected and despite, the affirmative duty placed on the defendants by the *Frazer* injunction to "engage in intensive recruitment for black applicants for ... Graduate Civil Engineer." [8] *Frazer*, 1976 WL 729, at *7.

Other evidence established that the Transportation Department had posted no job announcements, nor received applications in certain job categories, for as long as seven years, far longer than the two years that the court condemned as discriminatory in *Frazer*. For example, the defendants refused to receive applications for Civil Engineer–I and –II positions from 1974 to 1987, except for one three-week period in 1979 and a second three-week period in 1984. Defendants still did not take Civil Engineer–II applications up to the entry of consent decree I—opening that classification for only nine weeks in 20 years. Similar statistics were presented for many other job classifications. Evidence also showed maintenance of multiple registers, which supervisors could preview before determining from which to fill a job and which they could then use to manipulate the selection process so as assure the selection of persons whom the supervisors wanted, despite the relative qualifications of those under consideration and despite any roadblock the no-bypass rule might have place in the selection process.[9] The 1976 *Frazer* injunction specifically condemned previewing registers. *Id.* at *4.

**B.**

Article XIII, which was contained in the settlement submitted to the court in 1994, was intended to redress what appeared to be the Transportation Department's intentional effort to prevent African–Americans from being considered for GCE and higher positions by use of the EIT requirement beginning in 1983. Article XIII contained, in addition to ¶ 4, three other provisions relevant to the issue before the court: ¶¶ 1, 5, and 10.

*Paragraph 1*: Subpart (a) of ¶ 1 abolished use of the EIT test. It provides that, "On and after the effective date of the Consent Decree, EIT status and any associated tests will not be utilized as a prerequisite for the job of GCE." [10] The premise of ¶ 1 is obvious: to rid the Transportation Department of a device that had been adopted for racially-discriminatory reasons.

*Paragraph 4*: This paragraph, as stated, requires the reclassification of incumbent African–Americans to GCE positions if they meet the qualifications for the positions absent the EIT requirement. Paragraph 4 is therefore premised on the fact that, absent

8. This event was described in the March 16, 1984, memorandum as follows: "Perhaps the most undigestible example of practices which negatively affect minority employment is the one in which the GCE register which included ten minorities was abolished on March 30, 1983 by the apparently arbitrary inclusion of the requirement that the EIT examination be passed." *Id.*

9. Multiple registers were formed simultaneously for certain job classifications with applicants being eligible for each register on the basis of different entrance requirements. The types of registers formed simultaneously for a single job classification included: (a) open-competitive registers; (b) promotional registers; and (c) reemployment registers. Applicants are determined to be eligible for each of these types of registers on the basis of different criteria. Applicants eligible for both an open-competitive and a promotional register will be ranked on both, but their scores and ranks on each register can, and often will, be different because the scoring procedures differ from one register type to another and the number and identity of persons on each type register are different. An applicant who is ineligible for one type of register can be eligible for the other type.

10. Subparts (b) and (c) of ¶ 1 provide:

"(b) After the goals provided by the Consent Decree for the GCE job have been achieved, then in evaluating eligibles certified to it for the GCE job, the Highway Department may consider EIT status as a factor in the selection process but may not appoint a white applicant in preference to a black applicant based solely on EIT status.

"(c) Personnel will not utilize the EIT for scoring, ranking or certifying applicants for the position of GCE."

the EIT requirement, these African–American would have become GCEs, as had similarly-qualified white incumbents become GCEs in the past before the discriminatory imposition of the EIT requirement.

*Paragraph 5*: This paragraph requires that the Transportation Department offer, with back pay, to 20 African–American plaintiff class members, the jobs of GCE or other higher positions they would now hold with the Transportation Department "in the absence of the EIT and associated requirements."[11] Subpart (a) of ¶ 5 requires that the Transportation Department make offers to ten specifically-named persons,[12] while subpart (b) requires that the Transportation Department make offers to an additional ten unnamed persons who meet certain eligibility requirements.[13] The Transportation Depart-

ment is required to make a "reasonable and good faith effort" to find these additional persons.[14] However, under article XIII, if one of the persons specifically named in subpart (a) "is not appointed for any reason," then the Transportation Department is required to appoint an additional unnamed person in accordance with subpart (b). The result of this requirement is that if one of the persons named in subpart (a) declines an offer, then the Transportation Department must make eleven offers pursuant to subpart (b), and so on, until the Transportation Department has made a "reasonable and good faith" effort to find 20 African–American persons who will accept employment with the Transportation Department.[15]

Paragraph 5 reaches out beyond the circle of incumbent African–Americans, who could

11. There is no express language in ¶ 5 requiring that the Transportation Department pay back pay to these 20 persons. The parties have, however, consistently interpreted the paragraph to require such.

12. Subpart (a) of ¶ 5 provides:
"The following persons (if they have Civil Engineering or Civil Engineering Technology degrees) will be offered employment in the GCE job or in the job they would now hold with the Highway Department in the absence of the EIT and associated requirements (including the recency of degree requirement), whichever is higher, with the following credited service dates:

| | |
|---|---|
| Alfedo Acoff | March 30, 1983 |
| Peggy Vonsherie Allen | March 30, 1983 |
| Christopher Azaubuike | March 30, 1983 |
| Jeffery W. Brown | March 30, 1983 |
| Willie F. Franklin | March 30, 1983 |
| Macon Hinton | March 30, 1983 |
| Wayne M. Leonard | March 30, 1983 |
| Ronald D. Newsome | March 30, 1983 |
| Adenrele Odutola | March 30, 1983 |
| Rickey Richardson | March 30, 1983" |

13. Subpart (b) of ¶ 5 provides:
"Up to a maximum of 10 persons, plus one replacement for each person named in Paragraph 5(a) who is not appointed for any reason, black persons (if they have Civil Engineering or Civil Engineering Technology degrees) will (subject to availability) be appointed to the GCE job or the job they would now hold with the Highway Department in the absence of the EIT and associated requirements (including the recency of degree requirement), whichever is higher, provided that they satisfy the following conditions: (i) They applied during the period since the EIT requirement was adopted for the GCE job or they would have applied for

the GCE job but for the EIT requirement, and (ii) They were or would have been rejected because of not having EIT status, or other associated characteristics (including, but not limited to passing the FOE test and satisfying the recency of degree requirement) and (iii) They had degrees in Civil Engineering and Civil Engineering Technology at the time they applied or would have applied, and (iv) They would have been certified-out for GCE in the absence of their rejection for lack of EIT status or other associated characteristics as defined above."

Subparts (c), (d), and (e) provide:
"(c) The credited service date of such of the persons specified in Paragraph 5(b) above as accept such offers will be agreed to by the parties before notice of the offer of employment is given to them, subject to the following: (i) No such credited service date shall be earlier than March 30, 1983.
(ii) The standard for determining such service dates will be the approximate date each such person would have been appointed in the absence of the EIT and associated requirements.
"(d) The maximum number of persons provided for by Paragraph 5(a) and Paragraph 5(b) together is 20.
"(e) The State Personnel Department agrees to accept the appointment by the State Highway Department of such persons named or specified in Paragraphs 5(a) and 5(b) above as accept such offer, notwithstanding the inconsistency of such appointment (if any) with the Alabama Merit System Act."

14. *Reynolds v. Alabama Department of Transportation*, 1996 WL 420834, at *2 (M.D.Ala. April 23, 1996).

15. *Id.*

be viewed as obviously the victims of the EIT requirement and who were identified and addressed in ¶ 4. However, because ¶ 5 was not limited to incumbents, ¶ 5 sets forth additional requirements—that the African–Americans seeking relief under the provision have actually applied and been rejected for a GCE or higher position because of the EIT requirement, or would have applied for the position in the absence of the EIT requirement—to make sure that it targets only those African–Americans who could be reasonably viewed as victims of the EIT requirement.[16]

*Paragraph 10*: This paragraph requires the Transportation Department to identify all prior applicants for GCE jobs and "all black persons with degrees in Civil Engineering and Civil Engineering Technology from the colleges and universities which it will recruit under the terms of this Consent Decree," and to offer jobs to those who, upon their re-application and certification out by the Personnel Department, are determined by the Transportation Department to have been previously rejected because of the EIT requirement or associated requirement or who, upon their re-application and certification out by the Personnel Department, "can show a

reasonable probability that they would have applied in the absence of the EIT or associated requirements." [17]

The entire settlement was divided into three consent decrees. One of the consent decrees, commonly referred to as 'consent decree I,' was approved by the court on March 16, 1994.[18] Consent decree I contains ¶¶ 1, 5, and 10 of article XIII. Consent decree II, which contains ¶ 4, is still under submission with the court.

## II. DISCUSSION

As stated, the defendants and the Adams intervenors object to ¶ 4 of article XIII. Based on the evidence presented at the 1992 trial, the court must reject their objections.

The trial reflected that in the early 1980s, the Alabama Department of Transportation adopted the EIT requirement with the specific intent to limit the opportunity of African–Americans to be employed in GCE and higher positions.[19] As long as the applicant registers were white, the Transportation Department hired without the EIT requirement. Only when blacks became eligible, as a result of court-ordered relief, to appear on

---

**16.** Indeed, it appears that nine of the ten persons named in subpart (a) were on the ten-person list that was abolished in 1983. The record, however, does not explain this one-person discrepancy.

**17.** Paragraph 10 provides:

> "*Notice to applicants for GCE rejected because of the EIT requirement:*
> (a) To the extent it is able to do so, the Personnel Department will provide to the Highway Department the names and last known addresses for all black persons with degrees in Civil Engineering and Civil Engineering Technology who applied for the GCE job and were rejected because of not having EIT status or any associated characteristics as defined above. The Highway Department shall make reasonable efforts to identify the names and last known addresses of all black persons with degrees in Civil Engineering and Civil Engineering Technology from the colleges and universities which it will recruit under the terms of this Consent Decree.
> (b) The Highway Department will in turn give notice to such persons by certified mail, addressed to them at their last known address, advising them of the discontinuance of EIT status and associated characteristics as a prerequisite for the GCE job and enclosing a

blank application form so they can if they wish reapply with Personnel for the GCE job.
> (c) Those who reapply and are certified-out by the Personnel Department to the Highway Department for the GCE job will be offered employment by the Highway Department in the GCE job, assuming they satisfy the qualification standards of the job and, if they did not apply for the GCE job in the past, can show a reasonable probability that they would have applied in the absence of the EIT or associated requirements, including, but not limited to, the FOE exam and the recency of degree requirement.
> (d) Those not offered employment and hired in accordance with Paragraph (c) above would remain on the register under the conditions of the Register Purging provisions above."

**18.** *Reynolds v. Alabama Department of Transportation*, 1994 WL 899259 (M.D.Ala. March 16, 1994) (Doc. no. 553).

**19.** The court recognizes and emphasizes that this picture is based solely on the plaintiffs' case. The defendants have yet to present their entire case. The findings are therefore only preliminary, and all the court's comments throughout this order about the evidence should be taken as such.

the employment register in significant numbers, did the Transportation Department, suddenly and precipitously, impose the EIT and foreclose these black applicants from competing for these positions.

Article XIII was therefore intended to redress this discrimination. It essentially allowed certain African–Americans to enjoy the same opportunity whites had enjoyed (for many years when African–Americans were prohibited completely from working for the Transportation Department) of employment in GCE and other higher positions without having to meet the EIT requirement. The article leveled the playing field so that all persons, whites as wells as blacks, could be considered for these jobs under the same criteria.

### A.

■ The defendants and the Adams intervenors object to ¶ 4 because, as they contend, it is not targeted to those African–Americans who were victims of the EIT requirement. But, of all article XIII's provisions, ¶ 4 is probably the most targeted. It simply puts incumbent African–Americans, who lack the EIT requirement, on a par with whites, who lack the EIT requirement but still became, and continue to be, GCEs.

The defendants and the Adams intervenors maintain that these incumbent African–Americans are not victims of the EIT requirement because they never 'applied' for GCE jobs. The defendants and the Adams intervenors argue that ¶ 4, therefore, differs in this important respect from ¶¶ 5 and 10 because these latter provisions offer redress only to African–Americans who applied for GCE or higher positions or, at least, would have applied in the absence of the EIT requirement. The defendants and the Adams intervenors overlook an important aspect of the manner in which the defendants effected their racially discriminatory intent, however. The evidence at trial reflected that incumbent whites were often sought after, and, through manipulation of the selection process, · hand-picked for positions, despite the relative qualifications of all applicants and despite even the barrier of the no-bypass rule. The selection process, in which applica-

tions were solicited and people applied, was, if anything, only a ruse—that is, only a paper process to give the appearance of having utilized the competitive process—to allow Transportation Department supervisors to pick and choose whom they wanted, regardless of the requirements of the selection process. Because incumbent whites often did not have to go through any 'real' competitive process in which they applied for positions, neither should blacks. Paragraphs 5 and 10, unlike ¶ 4, impose the application requirement—that is, that those seeking relief have, at least, applied and been rejected, or presented evidence that, but for the EIT requirement, they would have applied—because the hand-picking was generally limited to instances in which incumbents were selected for positions.

The defendants and the Adams intervenors argue that ¶ 4 is racially discriminatory because its focus is only on African–Americans. But this limitation is logical. Because the EIT requirement was imposed between 1983 and 1994 to discriminate against African–Americans, the relief would have to identify and focus on African–Americans. As stated, the premise behind ¶ 4 is that, in the absence of the EIT requirement, African–American incumbent employees would have become GCEs, as had similarly-situated white incumbents become GCEs in the past, during the period when African–Americans could not even compete for such positions and before the imposition of the EIT requirement. To be sure, there are probably also some white persons who, although not the intended targets of discrimination, were denied GCE positions between 1983 and 1994 because they lacked EIT status. But this fact does not detract from the fact that black incumbents, as intended victims of racial discrimination, are entitled to redress for the discrimination they suffered. It may be that similarly-situated whites, though not intended victims of discrimination, should be made GCEs as well, but that matter is not before the court.

### B.

■ The defendants and the Adams intervenors argue that, because ¶ 4 is targeted to only African–American employees, it must be

subjected to 'strict scrutiny' analysis. Assuming that ¶ 4 must be subjected to such analysis, it still passes it.

It is now axiomatic that, absent necessary justification, the fourteenth amendment to the United States Constitution prohibits governmentally-imposed racially-discriminatory classifications. Under the equal protection clause, this court must apply strict scrutiny to race-conscious relief voluntarily implemented by a public employer, irrespective of whether the relief is embodied in merely a personnel decision or in a consent decree. The "purpose of strict scrutiny is to 'smoke out' illegitimate uses of race by assuring that the [defendant] is pursuing a goal important enough to warrant use of a highly suspect tool. The test also ensures that the means chosen 'fit' this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Richmond v. J.A. Croson Co.,* 488 U.S. 469, 493, 109 S.Ct. 706, 721, 102 L.Ed.2d 854 (1989). Thus, there are two prongs to the strict scrutiny analysis: first, "any racial classification 'must be justified by a compelling governmental interest,'" and, second, "the means chosen by the State to effectuate its purpose must be 'narrowly tailored to the achievement of that goal.'" *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 285, 106 S.Ct. 1842, 1852, 90 L.Ed.2d 260 (1986) (plurality opinion) (citations omitted). *See also Johnson v. Transportation Agency,* 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987); *Ensley Branch, NAACP v. Seibels,* 31 F.3d 1548, 1564 (11th Cir.1994); *Peightal v. Metropolitan Dade County,* 26 F.3d 1545, 1552 (11th Cir.1994); *In re Birmingham Reverse Discrimination Emp. Lit.,* 20 F.3d 1525, 1534 (11th Cir.1994), *cert. denied,* 514 U.S. 1065, 115 S.Ct. 1695, 131 L.Ed.2d 558 (1995); *Sims v. Montgomery County Comm'n,* 890 F.Supp. 1520, 1531–33 (M.D.Ala.1995) (Thompson, J.), *aff'd,* 119 F.3d 9 (11th Cir.1997) (table); *Sims v. Montgomery County Comm'n,* 887 F.Supp. 1479, 1486–89 (M.D.Ala.1995) (Thompson, J.), *aff'd,* 119 F.3d 9 (11th Cir.1997) (table); *Shuford v. Alabama State Bd. of Educ.,* 846 F.Supp. 1511, 1520 (M.D.Ala.1994) (Thompson, J.). The Supreme Court has indicated that the government "unquestionably has a

compelling interest in remedying past and present discrimination." *United States v. Paradise,* 480 U.S. 149, 167, 107 S.Ct. 1053, 1064, 94 L.Ed.2d 203 (1987) (plurality opinion). Whether race-conscious relief serves a remedial purpose with respect to past discrimination is an evidentiary issue. The court need not make 'formal findings' of discrimination; rather, there must be a "strong basis in evidence" for the conclusion that the consent decree or voluntary action remedies past discrimination. *Croson,* 488 U.S. at 500, 109 S.Ct. at 725 (quoting *Wygant,* 476 U.S. at 277, 106 S.Ct. at 1849); *see also Sims,* 887 F.Supp. at 1487.

The race-conscious relief before the court, therefore, is "lawful if it represents a 'narrowly-tailored' effort to remedy past ... discrimination" against African–Americans in the Transportation Department. *Stuart v. Roache,* 951 F.2d 446, 449 (1st Cir.1991), *cert. denied,* 504 U.S. 913, 112 S.Ct. 1948, 118 L.Ed.2d 553 (1992). The Supreme Court has set forth several factors to determine whether race-conscious relief is narrowly tailored: the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market (the 'over- or under-inclusiveness' of the relief); and the impact of relief on the rights of third parties. *Paradise,* 480 U.S. at 179, 107 S.Ct. at 1070; *Shuford,* 846 F.Supp. at 1528.

Paragraph 4 meets this demanding requirement: First, the court has set forth the extensive background history of race discrimination in the Alabama Department of Transportation. As stated, ¶ 4 targets African–American incumbents who are similarly situated to white incumbents who became GCEs without having to meet the EIT requirement during the period in which African–Americans were prohibited, simply because of their race, from becoming GCEs. Paragraph 4 is appropriate and necessary if relief is to be afforded to these African–Americans. Second, the provision is extremely short-lived; indeed, it is a one-time event. *See Paradise,* 480 U.S. at 178, 107 S.Ct. at 1070 (plurality opinion) (race-conscious relief was narrowly tailored because court expressed hope that

relief would be a "one-time occurrence") (quoting *Paradise v. Prescott*, 585 F.Supp. 72, 76 (M.D.Ala.1983) (Thompson, J.)); *Paradise*, 480 U.S. at 186, 107 S.Ct. at 1074 (Powell, J., concurring) (agreeing with plurality opinion because, among other things, "The District Court imposed the one-for-one promotion requirement only on one occasion, when it ordered the promotion of eight blacks and eight whites to the rank of corporal in February 1984"). Third, the provision is neither under-inclusive nor over-inclusive, and does not establish any quotas for the Transportation Department. It applies only to a narrow group of African–Americans. Indeed, it appears that fewer than a handful of African–Americans could even benefit from the provision today.[20] Fourth and finally, the impact on third parties is, at most, marginal. Paragraph 4 merely puts African–American incumbents on a par with white incumbents of equal qualifications. Or, more to the point, the paragraph puts African–American incumbents on a par with similarly-situated third-parties. As stated, it essentially momentarily levels the playing field between African–Americans and all others.

The above conclusion is based on the assumption that ¶ 4 requires strict-scrutiny analysis. In *Sims*, this court discussed how it is difficult, in an analytical sense, to distinguish 'any' settlement, to the extent and in the sense that it specifically targets an allegedly victimized African–American for relief, from race-conscious settlements that are traditionally viewed as requiring strict scrutiny. The court wrote:

> "Admittedly, as the Sims plaintiffs and the Scott intervenors argue, the Fifth, Sixth, and Tenth Circuit Courts of Appeals have held that 'a good faith settlement of a claim of past discrimination constitutes a legitimate, nondiscriminatory reason for making employment decisions.' *Marcantel v. State of La., Dept. of Transp. & Dev.*, 37 F.3d 197, 202 (5th Cir.1994). *See also*

*Carey v. U.S. Postal Service*, 812 F.2d 621 (10th Cir.1987); *EEOC v. McCall Printing Corp.*, 633 F.2d 1232 (6th Cir.1980). These cases, however, are not clear as to when a settlement is immune from a third-party attack because it is 'a good faith settlement' and when a settlement must be subjected to 'strict scrutiny' to withstand such an attack. Perhaps a distinction can be drawn between individual claims brought by one person and those brought by several persons, or between individual claims and class claims, or between individual relief and systemic relief. The court cannot say, however, that these differences, although existing in fact, logically and equitably warrant differences in treatment. Perhaps the best answer to the problem is that in *Marcantel, Carey*, and *McCall*, the appellate courts were essentially applying strict scrutiny analysis in concluding that the settlements were entered into in 'good faith' and thus were not subject to attack from adversely affected third parties. For example, in *Marcantel*, the Fifth Circuit Court, while noting the 'the negative impact on other employees,' 37 F.3d at 201, wrote:

> 'This Court is convinced that the consideration of a conciliation agreement which results in a consent decree as an act of discrimination against employees not benefitted by that agreement would create a situation in which each settlement would spark new rounds of litigation, settlement of claims would be discouraged, and the courts would be continually faced with stale claims.

> .     .     .     .     .

> 'We conclude that a good faith attempt by an employer to remedy past discrimination by entering a settlement agreement not only successfully meets the challenge of a prima facie case but is not

---

**20.** Since 1994, when consent decree I was approved, the seven or eight African–Americans to whom ¶ 4 would have applied have become, or have become eligible for, GCE or higher jobs under other provisions in the consent decree I (for example, in a companion order entered today, three African–Americans eligible for relief under ¶ 4 (Omoshalewa Olowokere, Edward L. Baldwin, and Emanual Oranika) are to receive promotions to GCE or higher positions based on ¶ 5(b) of article XIII) or have been otherwise promoted to such jobs. The record is unclear at this time, but it appears that there may be only one African–American (Benjamin Egiebor) to whom ¶ 4 still applies.

an independent discriminatory act against employees not parties to the agreement but adversely affected by it. Any other decision would discourage settlement and hamper employers in their attempts to redress past discrimination.

.    .    .    .    .

'This Court has noted previously that some latitude should be given to courts and employers attempting to correct past acts of discrimination. "The law is well settled that relief under Title VII cannot be denied simply because the interests of some employees will be negatively affected...." Rather, "[a]dequate protection of ... rights under Title VII may necessitate ... some adjustment of the rights of ... [other] employees. The Court must be free to deal equitably with conflicting interests of ... employees in order to shape remedies that will most effectively protect and redress the rights of the ... victims of discrimination.' "

.    .    .    .    .

'Finally, the plaintiff attempts to rely on the Supreme Court's decision in *Regents of the University of California v. Bakke* [438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) ] to make out his claim of reverse discrimination. The *Bakke* case dealt with an affirmative action program that set aside a specific number of positions for African–Americans. Thus, applicants who were not African–Americans were wholly precluded from competing for those positions, solely on the basis of race. The case before us is distinguishable from the *Bakke* decision: here Marcantel was not precluded from applying 'for the Highway Maintenance Superintendent position because he was not a member of a specified race. All potential applicants were affected regardless of their race.'

37 F.3d at 201–202 (citations and footnotes omitted)."

887 F.Supp. at 1488–89 n. 21. In its *Sims* opinion, the court then concluded with this observation: "Therefore, the more narrow the scope of the settlement and the more limited its impact on third parties, the more easily the settlement should pass a strict scrutiny analysis; and, conversely, the broader the scope and the greater the impact, the more difficult it may be for a settlement to pass strict scrutiny. The difference, for the purpose of strict scrutiny, between the proposed settlement now before this court and those before the courts in *Marcantel, Carey,* and *McCall* may be evidenced not by a bright line but by a continuum." *Id.*

This analysis from *Sims* posits that in a sense all settlements of discriminatory claims which provide relief targeted to a person of one classification and not another are subject to essentially increasing degrees of scrutiny depending upon the impact on others. Here, under this analysis, because the scope of ¶ 4 is narrow and the impact on third parties is limited, the relief is appropriate.

Accordingly, it is ORDERED:

(1) The objections made by the defendants and the Adams intervenors to ¶ 4 of article XIII of consent decree II are overruled.

(2) Paragraph 4 of article XIII of consent decree II is approved and adopted by the court.

(3) Defendants Alabama Department of Transportation and State Personnel Department and their officers, agents, servants, employees, and those persons in active participation with them who receive actual notice of this order, are each ENJOINED and RESTRAINED from failing forthwith to implement ¶ 4 of article XIII of consent decree II.

The clerk of the court is DIRECTED to issue a writ of injunction.

The clerk of the court is DIRECTED to provide for service of this injunction upon defendants Alabama Department of Transportation, Alabama State Personnel Department, and Halycon Ballard, Jimmy Butts by certified mail, returned receipt requested.